UNITED STATES DISTRICT COURT
DISTRICT OF VERMONT

LINDA ALLARD, CATHERINE BRYARS, SCOTT ELITHORPE, GALE ELMORE, ALFONSO GIORGI, NICOLE LEBERT, SHAWN LEGACY, and DEBORAH SWANSON,

Plaintiffs,

v.

SAINT-GOBAIN PERFORMANCE PLASTICS CORPORATION,
3M COMPANY,
E.I. DUPONT DE NEMOURS AND COMPANY, EIDP, INC., THE CHEMOURS COMPANY, and CORTEVA, INC.,

Defendants.

**Case No.: 2:26-cv-00291**

**COMPLAINT — CLASS ACTION**

**DEMAND FOR JURY TRIAL**

Plaintiffs, individually and on behalf of the putative classes of similarly situated persons defined herein, file this Master Class Action Complaint and allege as follows:

## STATEMENT OF THE CASE

1. This is a Class action on behalf of Plaintiffs and Class of people similarly situated who have been damaged and continue to be damaged by the wrongful conduct of Defendants Saint-Gobain Performance Plastics Corporation ("SGPP"), 3M Company ("3M"), E.I. DuPont De Nemours and Company, EIDP, Inc., The Chemours Company and Corteva, Inc., (all collectively referred to as "DuPont"), arising out of Defendants' manufacture, distribution, sale, use, handling,

release, discharge and disposal of perfluorooctanoic acid ("PFOA")[1] and products releasing PFOA, a known toxic, perfluorinated chemical, at manufacturing facilities located on Water Street in North Bennington and Northside Drive in Bennington, Vermont (the "SGPP Facilities"), which has resulted in the severe contamination of the local groundwater aquifer, soils, and private drinking water supply wells with PFOA in and around Shaftsbury and Bennington, Vermont. In particular, for over 20 years, Defendant SGPP, and its predecessor in interest Chemfab Corporation ("Chemfab"), utilized APFO and APFO-containing products, manufactured and sold by Defendants 3M and DuPont, in its manufacturing processes at the SGPP Facilities, and released significant amounts of PFOA into the environment through air emissions, as well as through various discharges to soils, sediments, and surface waters, thereby causing widespread groundwater and property contamination. Plaintiffs and Class Members bring negligence, nuisance, and strict liability claims and statutory causes of action against Defendants due to the diminution in property value, loss of use and enjoyment of property, annoyance, upset, aggravation and inconvenience and other damages which they have suffered as a result of the PFOA contamination caused by Defendants. Plaintiffs and Class Members seek damages and/or equitable relief pursuant to the Vermont Medical Monitoring Statute (12 V.S.A. § 7202). Plaintiffs and Class Members also seek damages and/or equitable relief for the unreasonable harm to groundwater caused by Defendants in violation of the Vermont Groundwater Protection Act (10 V.S.A. §1410) as a result of this PFOA contamination, and also seek further equitable and injunctive relief to compel Defendants to establish and implement remedial measures sufficient to permanently prevent the further contamination, and eliminate the current contamination, of

[1] "PFOA" is the acid form of ammonium perfluorooctanoate ("APFO"). APFO is the ammonium salt form of the molecule; it dissociates into PFOA in water and sublimes directly to PFOA vapor when heated. Both APFO and PFOA are frequently referred to as "C-8" because of the eight carbon structure of both molecules. In this complaint, APFO, PFOA and C-8 will be used to describe the same chemical.

Plaintiffs' and Class Members' properties and/or private drinking water supplies with PFOA.

## JURISDICTION AND VENUE

2. Subject matter jurisdiction is proper in this Court pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because members of the proposed Plaintiff classes include numerous citizens of the State of Vermont, and defendants are residents of different states, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs.

3. Personal jurisdiction is proper over Defendants because they were authorized to do business in Vermont, registered with the Vermont Secretary of State, transacting business with sufficient minimum contacts in Vermont, and/or otherwise intentionally availing themselves of the Vermont market through manufacturing, marketing, distribution, and/or sale of PFAS-containing products in Vermont so as to satisfy minimum contacts and to render the exercise of jurisdiction over Defendants by Vermont courts consistent with traditional notions of fair play and substantial justice. Due to Defendants' tortious conduct, Plaintiffs have foreseeably suffered harm in the State of Vermont as set forth herein.

4. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), because this action concerns damage to property located in this District, Defendants have conducted substantial business in this District, Defendants have caused harm to Class Members residing in this District, Plaintiffs reside in this District, and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in the District of Vermont.

## PARTIES

***Plaintiffs***

5. Plaintiff Linda Allard is a resident of the State of Vermont and Town of Bennington, owning property located at 295 Hickory Hill Road, Bennington Vermont. Plaintiff

Allard has resided at such residence since 2003 and has continuously consumed drinking water from a private well that was found to be contaminated with PFOA at 52.55 parts per trillion ("ppt") by the Vermont Department of Environmental Conservation ("VTDEC") on August 31, 2023. A point of entry treatment system ("POET") was installed on such well in October of 2023 and is still operating to remove PFOA from her drinking water. Upon information and belief, Plaintiff Allard has PFOA in her blood in excess of 2.00 parts per billion ("ppb") as a result of drinking contaminated water from her well for over two decades. Upon information and belief, the soil on Plaintiff Allard's property is also contaminated with PFOA. Upon information and belief, the PFOA contamination of Plaintiff Allard's property has reduced the resale value of such property.

6. Plaintiff Catherine Bryars is a resident of the State of Vermont, Town of Bennington, co-owning property located at 212 Middle Pownal Road, in Bennington, Vermont since 2017. Plaintiff Bryars has resided at such residence since 2017 and has continuously consumed drinking water from a private well that was found to be contaminated with PFOA at 33.1 ppt by VTDEC on October 30, 2023. A POET was installed on such well in 2024 and is still operating to remove PFOA from her drinking water. Upon information and belief, Plaintiff Bryars has PFOA in her blood in excess of 2.00 ppb as a result of drinking contaminated water from her well for seven years. Upon information and belief, the soil on Plaintiff Bryars' property is also contaminated with PFOA. Upon information and belief, the PFOA contamination of Plaintiff Bryars' property has reduced the resale value of such property.

7. Plaintiff Scott Elithorpe is a resident of the State of Vermont, Town of Shaftsbury, owning property located at 279 Furnace Brook Road since 1999. His property is located in close proximity to wells that have already tested positive for PFOA contamination. Upon information and belief, Plaintiff Elithorpe's soil is contaminated with PFOA and as a result, his drinking water

well is at risk of future PFOA contamination. Upon information and belief, the contamination on Plaintiff Elithorpe's property has reduced the resale value of such property.

8. Plaintiff Gale Elmore is a resident of the State of Vermont, Town of Bennington, owning property located at 1089 Main Street. Plaintiff Elmore resided at the property from her birth in 1955 until 2001, and again upon assuming ownership in 2012 to present. Her property is located in close proximity to wells that have already tested positive for PFOA contamination. Upon information and belief, Plaintiff Elmore's soil is contaminated with PFOA and as a result, her drinking water well is at risk of future PFOA contamination. Upon information and belief, the contamination on Plaintiff Elmore's property has reduced the resale value of such property.

9. Plaintiff Alfonso Giorgi is a resident of the State of Vermont, Town of Shaftsbury, co-owning property located at 72 Lucas Lane since 2009. Plaintiff Giorgi has resided at such residence since 2009 and continuously consumed drinking water from a private well dug in 2010 that was found to be contaminated with PFOA at 33 ppt by VTDEC on December 12, 2023. A POET was installed on such well in 2024 and is still operating to remove PFOA from his drinking water. Upon information and belief, Plaintiff Giorgi has PFOA in his blood in excess of 2.00 ppb as a result of drinking contaminated water from his well for over fourteen years. Upon information and belief, the soil on Plaintiff Giorgi's property is also contaminated with PFOA. Upon information and belief, the PFOA contamination of Plaintiff Giorgi's property has reduced the resale value of such property.

10. Plaintiff Nicole Lebert is a resident of the State of Vermont, Town of Bennington, owning property located at 17 Stonehedge Drive since 2019. Plaintiff Lebert has resided at such residence since 2019 and continuously consumed drinking water from a private well that was found to be contaminated with PFOA at 42.6 ppt on September 15, 2023. A POET was installed

on such well in January of 2024 and is still operating to remove PFOA from her drinking water. Upon information and belief, Plaintiff Lebert has PFOA in her blood in excess of 2.00 ppb as a result of drinking contaminated water from her well for over four years. Upon information and belief, the soil on Plaintiff Lebert's property is also contaminated with PFOA. Upon information and belief, the PFOA contamination of Plaintiff Lebert's property has reduced the resale value of such property.

11. Plaintiff Shawn Legacy is a resident of the State of Vermont, Town of Shaftsbury, co-owning property located at 76 Lucas Lane since 2001. Plaintiff Legacy has resided at such residence since 2009 and continuously consumed drinking water from a private well dug in 2010 that was found to be contaminated with PFOA at 17 ppt by VTDEC on December 12, 2023. A POET was installed on such well in January 2025 and is still operating to remove PFOA from his drinking water. Upon information and belief, Plaintiff Legacy has PFOA in his blood in excess of 2.00 ppb as a result of drinking contaminated water from his well for over twenty years. Upon information and belief, the soil on Plaintiff Legacy's property is also contaminated with PFOA. Upon information and belief, the PFOA contamination of Plaintiff Legacy's property has reduced the resale value of such property.

12. Plaintiff Deborah Swanson is a resident of the State of Vermont, Town of Shaftsbury, co-owning property located at 257 Lower East Road since 1996. Plaintiff Swanson has resided at such residence since 1996 and continuously consumed drinking water from a private well installed in 2003 that was found to be contaminated with PFOA at 19.1 ppt by VTDEC on January 24, 2024. A POET was installed on such well in June of 2025 and is still operating to remove PFOA from her drinking water. Upon information and belief, Plaintiff Swanson has PFOA in her blood in excess of 2.00 ppb as a result of drinking contaminated water from her well

for over twenty years. Upon information and belief, the soil on Plaintiff Swanson's property is also contaminated with PFOA. Upon information and belief, the PFOA contamination of Plaintiff Swanson's property has reduced the resale value of such property.

***Defendants***

13. Defendant SGPP is and was at all times relevant hereto a corporation organized under the laws of California with its principal executive office located at 20 Moores Road, Malvern, Pennsylvania. SGPP is registered to do business as a foreign corporation in the State of Vermont.

14. SGPP's parent company global headquarters are located in Courbevoie, France, and it is a multi-national corporation with more than 350 years of engineered materials expertise. It is one of the 100 largest industrial companies in the world with approximately $54 billion in sales in 2025.

15. SGPP is the world's leading producer of engineered, high-performance polymer products, serving virtually every major industry across the globe.

16. SGPP and its predecessor Chemfab, at various times as set out in more detail herein, operated manufacturing facilities in North Bennington and Bennington, Vermont, including the SGPP Facilities.

17. The VTDEC identified Defendant SGPP as a party responsible for the PFOA contamination in the local groundwater aquifer and numerous private drinking water supply wells in and around the Towns of Bennington and Shaftsbury, as a result of its operations at the SGPP Facilities.

18. Defendant EIDP, Inc. ("Old DuPont") is a foreign corporation authorized to do business in the State of Vermont and, at all times relevant hereto, has conducted business in this

District. E.I. du Pont de Nemours and Company changed its name to EIDP, Inc., in 2023. Among other acts and omissions, Defendant Old DuPont has for many years manufactured and supplied aqueous fluoropolymer dispersions (AFD) using the tradename Teflon® containing APFO to SGPP and its predecessor corporation, Chemfab, that operated fabric coating facilities in North Bennington, Vermont.

19. Defendant The Chemours Company ("Chemours") is a foreign corporation authorized to do business in the State of Vermont and, at all times relevant hereto, was conducting business in this District. Among other acts and omissions, Defendant Chemours has assumed PFAS-related liabilities from Old DuPont.

20. Defendant Corteva, Inc. ("Corteva") is a foreign corporation authorized to do business in the State of Vermont and, at all times relevant hereto, was conducting business in this District. Among other acts and omissions, Defendant Corteva has assumed PFAS-related liabilities from Old DuPont.

21. Defendant DuPont de Nemours, Inc. ("New DuPont") is a foreign corporation that conducts business in the State of Vermont and, at all times relevant hereto, was conducting business in this District. Among other acts and omissions, Defendant New DuPont has assumed PFAS-related liabilities from Old DuPont.

22. In 2015, Old DuPont spun off its performance chemicals business (which included the design, manufacture, marketing, and sale of PFAS, as well as a substantial portion of Old DuPont's PFAS-related environmental liabilities) to Chemours.

23. By 2013, Old DuPont understood that it faced massive, mounting environmental liabilities arising from its decades-long manufacture, use, marketing, sale, and distribution of PFAS, likely totaling in the billions of dollars.

24. Beginning in or around 2013, Old DuPont sought to isolate these PFAS-related liabilities from its billions of dollars in valuable assets and to evade responsibility for the environmental harms it caused. This scheme unfolded over several years and involved the creation of multiple new corporate entities.

25. The first major step in this scheme was the 2015 spinoff of Chemours, a newly formed entity that received Old DuPont's Performance Chemicals business. Along with this transfer, Old DuPont saddled Chemours with a significant portion of Old DuPont's environmental liabilities.

26. Per the separation agreement between Old DuPont and Chemours, Chemours assumed liabilities related to Old DuPont's manufacture, use, and sale of PFAS and agreed to indemnify Old DuPont against all liabilities associated with the Performance Chemicals business—regardless of when those liabilities arose and against whom those liabilities are asserted or determined.

27. Internally, Old DuPont knew that Chemours lacked the financial resources to adequately cover the PFAS-related liabilities Old DuPont had transferred to Chemours.

28. In 2017, Old DuPont completed a merger with The Dow Chemical Company ("Old Dow") to create DowDuPont, Inc. This so-called "merger of equals" was carefully structured to avoid exposing Old Dow's assets to Old DuPont's PFAS liabilities. Rather than a true integration, this transaction served as a temporary restructuring vehicle by which Old DuPont sought to further separate the company's valuable assets from its PFAS liabilities and other environmental obligations.

29. Following the merger, assets were stripped out of Old DuPont and transferred to DowDuPont, which then mixed and combined the assets of Old DuPont with the assets of Old

Dow. DowDuPont then organized its business into three distinct business segments: Agriculture, Materials Science, and Specialty Products.

30. This restructuring paved the way for the creation of three independent companies by 2019: (1) Corteva, which holds the Agriculture business and became the parent holding company of Old DuPont; (2) Dow, Inc. ("New Dow"), which holds the Materials Science business and became the parent company of Old Dow; and (3) DuPont de Nemours, Inc. (i.e., New DuPont), which was formerly known as DowDuPont and retained the Specialty Products business as well as some non-core business segments and product lines once belonging to Old DuPont.

31. Pursuant to the separation agreement between Corteva, New Dow, and DowDuPont/New DuPont, Corteva and New DuPont have each assumed responsibility for certain Old DuPont liabilities, including Old DuPont liabilities related to PFAS.

32. Further, to resolve a lawsuit, Chemours, Old DuPont, New DuPont, and Corteva agreed to accept responsibility for and to allocate liabilities related to PFAS.

33. Defendant 3M is and was at all times relevant hereto a corporation organized under the laws of Minnesota with its principal executive office located at 3M Center Building 220-9E-02, Saint Paul, Minnesota. 3M is registered to do business as a foreign corporation in the State of Vermont. At all times relevant hereto, Defendant 3M conducted business in the State of Vermont. It manufactured APFO, including its product FC-143, and sold its APFO containing products to Defendant SGPP and its predecessor Chemfab. These products were used as an additive to AFD in Defendant SGPP and Chemfab's manufacturing processes as described herein. In addition, 3M sold Chemfab FC-170C, which was a sulfonated perfluorochemical that can degrade into perfluorooctanesulfonate (PFOS).

34. Defendant 3M manufactured and sold APFO to DuPont and other manufacturers

for production of AFD and other fluoropolymer products, including polytetrafluorethylene ("PTFE") and fluorinated ethylene propylene ("FEP")[2] dispersion products through approximately 2002, and these AFD products were sold to defendant SGPP and its predecessor Chemfab and used at the SGPP Facilities in the manufacturing processes as described herein.

## GENERAL FACTUAL ALLEGATIONS

**Background Regarding PFOA**

35. Ammonium Perfluorooctanoate ("APFO") dissociates in water to form perfluorooctanoate (PFO-) and under acidic conditions is protonated to form perfluorooctanoic acid ("PFOA").

36. At temperatures over 150 ° C APFO sublimes (converts from solid form directly into a gas) into PFOA vapor.

37. PFOA is a fluorinated organic chemical that is part of a larger group of chemicals referred to as perfluoroalkyl substances ("PFAS") or perfluorochemical compounds ("PFC") that include PFOS.

38. PFOA and all PFCs are human-made chemicals that are not found in nature.

39. 3M is the inventor and original manufacturer of APFO having begun manufacturing the chemical in approximately 1947 at its Cottage Grove plant in Minnesota. It ceased selling APFO in or about 2002.

40. Defendant DuPont began manufacturing APFO after 3M chose to stop selling the chemical in 2002, and DuPont then continued to manufacture APFO and use it in its manufacturing processes until approximately 2014.

---

[2] References to AFD are intended to also include PTFE, FEP and other APFO-containing dispersions manufactured by defendants DuPont and 3M.

41. Historically, APFO was used as a polymerization aid in manufacturing fluoropolymers and as a surfactant and wetting agent in AFD.

42. PFOA is a white solid at ambient temperature, but sublimates to a vapor when heated during processing of AFD and during the manufacturing of PTFE fine powder. When AFD is heated to coat fabric and other substrates, PFOA vaporizes out of the AFD and is exhausted through stacks at manufacturing facilities. When PFOA cools, it condenses back into solid form and, within minutes, it coagulates and forms micro-sized particulates ranging from 0.1µm to 1µm in diameter that are then carried by the wind until they settle to the ground (dry deposition) or are washed from the atmosphere by precipitation (wet deposition). Because of its high solubility in water, when PFOA particulate matter settles into soil through dry or wet deposition, it readily percolates down deeper to contaminate groundwater.

43. Due to its chemical structure, PFOA is biologically and chemically stable in the environment and is strongly resistant to environmental degradation to the point of being virtually indestructible under environmental conditions. Thus, PFOA remains present in the environment indefinitely after it is initially released earning it the moniker "a forever chemical". There is no known environmental breakdown mechanism for PFOA. It is readily absorbed into biota and accumulates with repeated exposure.

44. In 2006, the United States Environmental Protection Agency ("EPA") implemented a global stewardship program that included eight major perfluoroalkyl manufacturing companies, including Defendants DuPont and 3M. The stewardship program's goal was to achieve a 95% reduction of global facility emissions of PFOA and chemicals that degrade into PFOA by 2010, and eliminate PFOA from emissions and products by 2015. According to the EPA, all eight companies that participated in the program have attested that

they phased out PFOA, and chemicals that degrade to PFOA, from emissions and products by the end of 2015.

**PFOA is a Toxic Chemical**

45. PFOA is a proven toxic substance as it is (i) listed on the EPA's Consolidated List of Chemicals subject to the Comprehensive Environmental Response, Compensation, and Liability Act, (ii) defined as a "hazardous material" under 10 V.S.A. § 6602, (iii) testing has produced evidence recognized by the National Institute for Occupational Safety and Health and/or the EPA that it poses acute or chronic health hazards, (iv) it is the subject of a Department of Health public health advisory, (v) has been classified as a likely human carcinogen by EPA, (vi) has been classified as a Group 1 human carcinogen by IARC and (vii) exposure to PFOA is shown by expert testimony to increase the risk of developing a serious latent disease.

46. PFOA exposure has also been linked in epidemiological studies to a number of non-cancerous adverse health effects, including hypercholesterolemia, thyroid disease, ulcerative colitis, elevated uric acid levels, and pre-eclampsia. PFOA's toxicity and persistence in the environment make it dangerous to human health and the environment.

47. In May 2006, the EPA Science Advisory Board stated that PFOA cancer data are consistent with guidelines suggesting exposure to the chemical is "likely to be carcinogenic to humans." These health conditions can arise months or years after exposure to PFOA. In August 2022, the Science Advisory Board issued a final determination that PFOA is a "likely carcinogen."

48. When humans are exposed to PFOA, this toxic chemical binds to plasma proteins in the blood and is readily absorbed and distributed throughout the body. The liver and kidneys are important binding and processing sites for PFOA, resulting in physiologic changes to these and other organs. Because of strong carbon-fluorine bonds, PFOA is stable to metabolic

degradation, resistant to biotransformation, and has a long half-life in the body. This toxic chemical accumulates in the body over time and causes long-term physiologic alterations and damage to the blood, liver, kidneys, immune system, and other organs.

49. The C8 Science Panel identified kidney cancer and testicular cancer as having a "probable link" to PFOA exposure in the Mid-Ohio Valley population exposed to PFOA in drinking water. Epidemiological studies of workers exposed to PFOA on the job support the association between PFOA exposure and both kidney and testicular cancer and also suggest associations with prostate and ovarian cancer and non-Hodgkin's lymphoma. Rodent studies also support the link with cancer.

50. Additionally, the C8 Science Panel found a probable link between exposure to PFOA and the following human diseases: thyroid disease, pregnancy-induced hypertension, ulcerative colitis, and high cholesterol. Furthermore, in recent years, immunotoxicity of PFOA and related compounds has been demonstrated in a wide variety of species and models, including humans. For instance, a study of ninety-nine Norwegian children at age three found that maternal serum PFOA concentrations were associated with decreased vaccine responses, especially toward rubella vaccine, and increased frequencies of common cold and gastroenteritis. The combined human and experimental evidence strongly supports adverse effects on immune functions at relatively low exposure levels.

51. In 2022, the National Academies of Sciences, Engineering and Medicine ("NASEM") issued a Consensus Study Report titled "Guidance of PFAS Exposure, Testing and Clinical Follow-Up. A distinguished panel of scientist from multiple disciplines was asked to advise on per-and polyfluoroalkyl substances ("PFAS") testing and clinical care for patients exposed to PFAS, which includes PFOA. To arrive at its conclusions, the Committee reviewed the

current science regarding PFAS exposure and human health effects. The Committee recommends that individuals who have 2 ppb of PFAS (including PFOA) in their blood or greater undergo PFAS medical screening for certain health effects associated with PFAS exposure.

52. In 2023, the International Agency for Research on Cancer ("IARC") classified PFOA as carcinogenic to humans (Group 1) and PFOS as possibly carcinogenic to humans (Group 2B). In 2024, EPA concluded that both PFOA and PFOS are likely to be carcinogenic in humans.

53. Defendant DuPont received inquiries regarding the toxicity of PFOA as early as 1954 and historical documents demonstrate a recognized concern for the toxicity of the chemical from the 1950s through the time it discontinued use of the chemical.

54. Defendant Dupont conducted its first toxicological experiments with C-8 in 1961 when it exposed rats to the chemical and found liver enlargement at virtually all doses. In this timeframe, Defendant DuPont's scientists were already testing substitute chemicals that were lower in toxicity and cheaper to purchase in an effort to replace PFOA

55. Internal historical documents from Defendant 3M show that company scientists were aware of the health risks of PFOA as early as the 1960s.

56. In 1976 researchers from the University of Rochester published a report that showed widespread contamination of human tissues with organofluorine compounds (organic compounds that contain the carbon-fluorine bond) which likely derived from commercial sources such as PFOA. The authors contacted Defendant 3M questioning whether its consumer products containing these compounds could be the source. J.D. LaZerte of Defendant 3M advised W.S. Guy, one of the researchers on the project, "not to speculate" on the source of the organofluorine compounds found in human tissues and, upon information and belief, 3M took no further action to investigate this issue.

57. By 1978, Defendant DuPont knew from a Defendant 3M study that C-8 in the environment did not biodegrade.

58. By 1978, Defendant 3M found elevated organic fluorine levels in the blood of its workers exposed to fluorinated surfactants such as PFOA.

59. When Defendant DuPont learned of these elevated levels in Defendant 3M's workers, it too documented high concentrations of PFOA in the blood of its factory workers at its Washington Works facility, showing that PFOA bioaccumulates and is not easily removed from the body due to a half-life of 2-8 years.

60. In 1978, Bruce Karrh, M.D., Defendant DuPont's Corporate Medical Director, published an article in a professional journal stating: "It is the duty of every company's management to discover and reveal the unvarnished facts about health hazards. . . [A] company should disclose health-hazard information. It should be candid, and lay all the facts on the table. This is the only responsible and ethical way to go. This approach is the correct one, of course and it is the way we try to proceed at DuPont."

61. By September of 1978, Defendant DuPont had reviewed medical records of 11 operators and 18 laboratory workers with long-term exposure to PFOA and found that more of them than anticipated had abnormal liver function tests.

62. In the late 1970s, Defendant 3M consulted with Dr. Harold C. Hodge of the University of Rochester. At a meeting in 1978, Dr. Hodge told Defendant 3M's Medical Director, Dr. F.A. Ubel, that physical examination results of employees should be compared with controls. "There appears to be indications of liver change from the physical examination results. In terms of indicators of liver disorder, there are [sic] a higher percentage at Chemolite [a 3M facility] than at Decatur [another 3M facility] and the organically bound fluorine level at Chemolite is

correspondingly higher." Dr. Hodge indicated to Defendant 3M at this time that a potential hazard was present regarding organofluorine chemical exposure to its workers.

63. A joint meeting was held in 1979 between Defendant 3M's fluorochemical exposure committee and Defendant DuPont's Eugene Berman and several colleagues. Both companies' representatives agreed that since there were no *established* adverse health effects associated with the findings of accumulated fluorochemicals in the blood of workers at the two companies, there was no reason to provide an 8(e) notification under Toxic Substance Control Act ("TSCA") to the EPA regarding these findings. Meeting minutes indicate that a discussion transpired as to whether they would make any efforts to seek evidence of a possible association between worker blood levels and illness: "DuPont was asked if they had carried out any chronic studies on fluorochemicals in the past and if they planned any in the future. In both cases the answer was negative. Fluorochemicals have a low priority in their chronic testing program. They would not carry out such studies unless they were forced to by regulations."

64. In 1979, Defendant DuPont found increased PFOA levels in the blood of eight workers who worked in the FEP polymerization and TFE dispersion polymerization processes, with the average blood level for PFOA among the eight workers being 8.2 ppm (8,200 ppb).

65. In 1979, Defendant DuPont was aware that blood test results of its Washington Works employees showed organic fluoride levels were associated with increases in liver enzyme levels, indicating possible liver damage. Defendants DuPont and 3M were also aware that PFOA exposure caused adverse health effects both Rhesus monkeys and Charles River CD rats, but that the "monkeys were more severely affected of the two." Both learned that "the data on monkeys suggested increased incidences of chronic interstitial nephritis [kidney damage], hyperkeratosis in the skin and a slight increase in skeletal muscle atrophy … Similarly, the data on rats suggest

hepatocellular necrosis [liver damage], sinusoidal liver congestion and the presence of yellow-brown pigment in the epithelium of the convoluted tubules of the kidney." The 90-day oral study in Rhesus monkeys had been administered at dosage levels of 0, 3, 10, 30 and 100 mg/kg/day of PFOA, with the monkeys receiving the highest dose dying during weeks 2-5 of the study, three of the monkeys receiving the 30 mg/kg/day dose also died during weeks 7-12 of the study while all monkeys exposed at this dose showed signs of toxicity in the gastrointestinal tract and other adverse changes. Monkeys dosed at the two highest levels also showed weight loss from the first week of the study.

66. In 1979, Defendant DuPont also learned that PFOA caused metabolic abnormalities in rats and altered immunochemical reaction of bovine (cow) serum albumin. It also was aware at that time that: 1) PFOA caused liver enlargement in rats and death at high doses; 2) increases in plasma enzyme levels indicative of cellular damage in dogs and death at high doses; and 3) inhaled doses in rats for only four hours could cause liver enlargement and corneal opacity.

67. Based upon the adverse health effects of PFOA on laboratory animals, in 1979 Defendant DuPont established a provisional PFOA acceptable exposure level for its employees of 0.01 mg/m3 in air based upon an 8-hour time-weighted average exposure.

68. Early PFOA toxicology studies commissioned by Defendant 3M were summarized in 1980 with the liver was highlighted as a target organ, while effects on the immune system were also reported. The study reports were not submitted to the EPA until 2000, the same year Defendant 3M decided to stop manufacturing PFOA, but most, if not all reports, were shared with Defendant DuPont years earlier.

69. By 1980, Defendant DuPont had internally confirmed that PFOA "is toxic,"

"people accumulate" the chemical in their bodies after exposure and "continued exposure is not tolerable." At this same time, Defendant DuPont documented that sixteen of its workers had PFOA blood serum levels of between 4.97 ppm and 21.69 ppm (4,970 ppb and 21,690 ppb).

70. In materials from a C-8 Communications meeting dated July 31, 1980, an employee of Defendant DuPont stated: "After 25 years of handling C-8, we see no damage among workers. However the potential is there – C-8 has accumulated in the blood. Because of this accumulation we have decided to undertake programs to minimize accumulation of C-8 in the blood in the workers."

71. By 1981, Defendant DuPont was aware that PFOA in the blood serum of a pregnant woman could cross the placenta to the fetus. PFOA was found to be present in the umbilical cord blood of an infant born to an employee and in the blood of an infant born to another employee.

72. An experimental study conducted by Defendant 3M in 1981 showed birth defects in the eye lens of rats exposed to PFOA. In March of 1981, Defendant 3M informed Defendant DuPont of the rat study, prompting DuPont to survey children born to PFOA exposed workers of its Teflon® Division. It found birth defects in two of seven children, both of whom had eye defects. Defendant DuPont then removed all female employees from PFOA exposed jobs but did not inform them of the reason for their transfer.

73. By the early 1980's, Defendants DuPont and 3M were sharing their internal studies concerning health and environmental effects associated with exposure to PFOA, but did not share them publicly.

74. In 1982, Defendant DuPont calculated that approximately 40 percent of the PFOA vapor inhaled was retained in the blood of human males.

75. On November 23, 1982, Defendant DuPont's Medical Director, Bruce Karrh, MD,

wrote in an internal memorandum: a) "Our knowledge of the product health effects of long-term exposure to low levels of C-8 is quite limited"; b) "C-8 is retained in the blood for a long time, creating concern in other areas such as blood donations, etc."; and c) "All employees, not just Teflon area workers, are exposed."

76. By September of 1984, Defendant 3M's medical service team noticed an increasing trend in worker organic fluorine concentrations in blood testing that had begun eight years earlier. The team advised "we must view this present trend with serious concern . . . exposure opportunities are providing a potential uptake of fluorochemicals that exceeds excretion capabilities of the body."

77. Thereafter, Defendant 3M endeavored to search for any blood samples among its workers that were free of organofluorine compounds. When this was unsuccessful, an internal 3M document proposed: "It is in the interest of 3M to strengthen the evidence of non-industrial sources of organic fluorine in normal human blood." 3M initiated efforts beginning in 1993 to show that organic fluorine in blood could be from entirely natural sources but it was unable to find any data to support this hypothesis leaving PFOA the probable source of these compounds in its employees' blood.

78. By June 14, 1984, Defendant DuPont was aware from analysis of blood testing of former Teflon® Division employees that the average biological half-life of PFOA in human blood was approximately 2.4 years with considerable variability among individuals.

79. On June 12, 1987, H.A. Smith of the Safety, Energy & Environmental Affairs office of Defendant DuPont's Manufacturing Division made a request to DuPont's Haskell Laboratory that it establish an acceptable level of PFOA in the blood and in drinking water.

80. On March 9, 1988, Defendant DuPont recommended a community exposure

guideline ("CEG") for drinking water for PFOA of 1 µg/L (ppb). This was adopted by Defendant DuPont in June of 1991 and was intended to be protective for community consumption of PFOA contaminated drinking water. It never advised its customers of its PFOA-containing products that it had established a CEG for PFOA in drinking water.

81. A 1990 Defendant DuPont internal industrial hygiene data review found PFOA blood levels an order of magnitude or more higher than the levels in PFOA-contaminated air, which demonstrated that PFOA bioaccumulated inside the human body.

82. By 1990, Defendant DuPont was aware that PFOA was associated with increased rates of carcinogenicity in rats, including Leydig cell adenomas of the testis, which are precursor lesions to testicular cancer. In an April 12, 1990, memo entitled "Investigation of Hormonal Mechanisms for C-8 Induced Leydig Cell Adenoma" by Mark Hurtt and Jon Cook of Defendant DuPont's Haskell Laboratory, the authors reviewed data derived from a Defendant 3M animal study and concluded that the induction of Leydig cell adenoma related to PFOA exposure was likely to be hormonally mediated and a similar human reaction could not be ruled out.

83. By 1991 DuPont scientists were recommending that a warning about potential C-8 health hazards should be included in Material Safety Data Sheets for all products that contained more than 0.1% or more of C-8, which included all Teflon® dispersion products.

84. Also, by 1991, DuPont recognized that there was an increased incidence of certain cancers among employees of its Washington Works facility, including kidney and bladder cancers. A meeting was held to determine whether it should conduct a full-blown epidemiological study of this cancer incidence increase, at which it was concluded the company should "do the study after we get sued."

85. In the unpublished 1992 thesis of Frank Gilliland, MD, who studied the clinical

pathology parameters of 111 male workers at Defendant 3M's Cottage Grove Plant, Dr. Gilliland concluded that PFOA may affect male reproductive hormones, and that thyroid effects in 3M production workers may be associated with organofluorine concentrations in worker blood serum.

86. In 1993, Defendant DuPont's health experts recommended an attempt be made to correlate adverse health effects of workers with their level of exposure to PFOA. This recommendation was rejected.

87. By 1993, Defendant 3M began to monitor PFOA levels in the blood serum of its production workers and conducted a mortality study of such workers showing a three-fold excess occurrence of prostate cancer in workers employed more than ten years.

88. By 1994, Defendant DuPont knew that C-8 was an animal carcinogen and caused tumors in the testis, liver and pancreas of test animals. Its employee Michael Gell expressed his concern about the safety of DuPont's Teflon® dispersion products when used by customers like the SGPP Facilities: "I am concerned that we may have a product stewardship issue if we have a finish [Teflon® AFD product] that contains a suspect carcinogen that is made and processed on a DuPont site and then goes out to a potentially uniformed customer. If that customer does not handle the product with adequate precautions there could be a backlash to DuPont as the supplier."

89. Later in 1994 at a meeting of the PTFE Toxicology Working Group attended by the head of Defendant DuPont's Haskell Laboratory, Gerald Kennedy, the group discussed the fact that APFO had been determined to be an animal carcinogen and the implications of that finding for people exposed to the chemical. They were concerned that this unregulated manmade chemical would someday be regulated by governmental agencies. The minutes of this

meeting state: "The group agreed that the currently available information was insufficient to allow a full evaluation of the implications of the carcinogenicity findings for human health. The level of concern was generally low and it was generally believed that occupational exposure levels of the order of that recommended by ACGIH would be adequate. Of greater concern than the finding of carcinogenicity itself was the apparent long half life of APFO in humans. Nevertheless, it was recognized that these beliefs were based on conjecture and hypothesis, not fact. If the regulatory authorities were to be convinced, additional data was required."

90. In 1994, Alan Ducatman, M.D., then Professor of Medicine at West Virginia University School of Medicine, called Defendant DuPont's Medical Director Dr. Bruce Karrh and shared his opinion that PFOA was on the fast track to being identified as a potential human carcinogen.

91. In 1995, when Defendant 3M discussed Defendant DuPont's study results, showing cancer in male rats exposed to PFOA, with colleagues from the UK company ICI, which used APFO in its manufacturing processes, ICI strongly espoused that APFO should be considered an animal carcinogen, as the benign tumors observed are simply early lesions that ultimately lead to malignant tumors, but Defendant 3M representatives disagreed.

92. A 1995 email from William Haaf, a toxicologist at Defendant DuPont's Haskell Laboratory to John Migliori, a DuPont employee involved in industrial hygiene, candidly stated "I could make a case we have no idea what long term effects will or will not occur" from exposure to PFOA.

93. In 1996, Defendant DuPont's officials discussed establishing a medical surveillance program for its workers exposed to PFOA. Such a program was never initiated. In April of 2000, Defendant DuPont again rejected its occupational health official's

recommendation for a comprehensive medical surveillance program for employees exposed to PFOA, noting that establishing such a program "could have significant repercussions at any of our other sites that handle . . . similar products."

94. In 1996, Defendant DuPont established the C-8 Program with stated goals of "[m]aintain[ing] a reasonable certainty [that PFOA exposure caused] no harm to human health [or] … the environment." A central component of achieving that goal was for DuPont to conduct a "risk analysis" which would "refine conditions which produce a reasonable certainty of no short- or long-term harm to human health and the environment."

95. As part of the human health risk assessment, Defendants DuPont and 3M, and the Association of Plastic Manufacturers in Europe (APME) collaborated on a study exposing monkeys to PFOA to better understand the toxicity of PFOA and the risk to human health (the "Monkey Study").

96. As of January of 1997, researchers at Defendant DuPont were aware of a hormonally mediated mechanism for the Leydig cell tumors in rat testes. In a document entitled "Hazard Characterization for Human Health in C8 Exposures, CAS Registry No. 3825-26-1," Lisa B. Biegel, Ph.D., Senior Research toxicologist at Defendant DuPont's Haskell Laboratory wrote: "The studies summarized below support a hormonally-mediated mechanism for the Leydig cell tumorigenesis: C8 produces an increase in hepatic aromatase activity, which elevates serum estradiol concentrations, which in turn modulates growth factors in the testes, which results in tumor formation…. The mechanism of tumorigenesis is not completely understood, and therefore relevance to humans cannot be completely ruled out. However, it is known that non-genotoxic compounds (such as C8) produce Leydig cell tumors by altering the endocrine system."

97. A paper published in 1997 by John C. Cook of Defendant DuPont together with

Eric D. Clegg concluded: "Occurrence of Leydig cell adenomas in test species is of potential concern as both a carcinogenic and reproductive effect if this mode of induction and potential exposure cannot be ruled out as relevant for humans [and]… it should be assumed that humans are potentially susceptible."

98. On October 22, 1999, Defendant DuPont received the results of the Monkey Study including that one high dose monkey died from exposure as did one low dose monkey with all doses causing increases in liver weight thereby increasing the chances of mutation and increased risk of tumors.

99. A month later, in November 1999, Defendants 3M and DuPont determined EPA had to be advised of these results to comply with a federal law that requires disclosures of information about a chemical that indicates it presents a "substantial risk of injury to health or the environment" and filed TSCA 8(e) disclosures with EPA.

100. As a result of the Monkey Study results, Defendant DuPont's Haskell Laboratory determined that no safe level of exposure to PFOA in humans could be established.

101. In March of 2000, Defendant DuPont abandoned its C-8 Program without conducting the planned human risk assessment and environmental risk assessment.

102. Another goal of the C-8 Program had been to develop an alternative to PFOA in the manufacture of its Teflon® fluoropolymer products. Several alternatives to PFOA were considered, but the one with the greatest potential and lowest toxicity, H4C8, was abandoned because its production cost would have reduced Defendant DuPont's AFD profit margin.

103. When the C-8 Program was abandoned in March of 2000, Defendant DuPont decided to continue to use PFOA and to abandon its goal of replacing the chemical with one that was less toxic and less environmentally persistent.

104. In April of 2000, EPA contacted Defendant DuPont and requested all information Defendant DuPont possessed relevant to PFOA, including: "health effects studies (including pharmacokinetics), environmental fate studies and information, and human and environmental exposure studies and information, including monitoring."

105. In early 2000, the EPA notified Defendant 3M that it intended to pursue more rigorous regulation of the perfluorinated chemicals 3M manufactured. In May of 2000, Defendant 3M announced it would stop manufacturing both PFOA and PFOS because of toxicity concerns, and it stopped selling PFOA in approximately 2002. Upon information and belief, Defendant 3M made this decision to forgo selling a product that generated substantial revenue and a large profit margin due to concerns of future liability and regulatory action.

106. On June 23, 2000, Gerald Kennedy, head of Defendant DuPont's Haskell Laboratories, sent a letter to Charles Auer of EPA in response to EPA's inquiry with an attachment entitled Voluntary Use and Exposure Information Profile. This letter and attachment contained numerous material misstatements of fact that Defendant DuPont knew or should have known were false, including: a) a relatively small amount of APFO leaves Defendant DuPont facilities in fluoropolymer dispersion products; b) greater than 97% of the APFO in dispersions was destroyed in processing; c) most applications of its dispersion products involved a sintering step where APFO was destroyed; d) there were only a "small number" of applications where dispersion products were heated to temperatures where APFO would sublime resulting in air emissions.

107. After Defendant 3M announced it would stop selling APFO by 2002, which occurred shortly after Defendant DuPont abandoned its C-8 Program seeking an alternative to APFO, Defendant DuPont scrambled to find a new source of APFO for use in production of its

Teflon® products and established a Steering Team to evaluate alternative strategies to secure a future supply of APFO. That Steering Team developed a "Liability Continuum" to evaluate future liability risk to Defendant DuPont for each of the possible alternatives and eventually concluded that making APFO for its own internal use and not selling it to competitors was the best balance between maintaining profitability and reducing future liability risk.

108. In early 2001, Defendant DuPont announced its decision to build an APFO manufacturing facility in Fayetteville, N.C. so it could continue to manufacture fluoropolymer products including AFD with APFO after Defendant 3M ceased selling the chemical.

109. In March of 2002, a Defendant DuPont website titled "C-8 INFORM" continued to state that PFOA had no adverse health effects: "In more than 50 years of C-8 use by DuPont and others, there have been no known adverse human health effects associated with the chemical. 3M and DuPont studies, as well as extensive other scientific data, support the position of no known adverse human health effects associated with C-8."

110. In 2003, Defendant 3M conducted a mortality study of its workers exposed to PFOS, a chemical in the PFAS family closely related to PFOA, and reported excess bladder cancer incidence with high exposure jobs.

111. A mortality registry kept by Defendant DuPont demonstrated an excess of kidney cancer deaths over expected levels for workers at the Washington Works plant.

112. On or about July 7, 2004, EPA filed a formal complaint against Defendant DuPont for TSCA reporting violations based upon its withholding of important information about PFOA toxicity from EPA. A settlement was reached that required Defendant DuPont to pay the largest civil administrative penalty in EPA history at the time.

113. After Defendant DuPont began manufacturing APFO and continued to use it to

manufacture its AFD products, it deliberately distributed misinformation to its customers and the public that exposure to PFOA was safe. Defendant DuPont established an Epidemiology Review Board comprised of independent epidemiologists and scientists to add credence to its public statements that PFOA was not harmful to humans. However, in March of 2006, the members of this review board pushed back against those statements, telling Defendant DuPont in a memo "We believe no party can claim sufficient knowledge that PFOA does or does not pose any risk to health. Thus, we question the evidential basis of DuPont's public expression asserting that PFOA does not pose a risk to health."

**Defendant SGPP's Knowledge of Potential PFOA Risk to Human Health**

114. On February 27, 1995, a contingent from Defendant DuPont visited the Chemfab facility in North Bennington to exchange information about Defendant DuPont's products. During this meeting, Defendant DuPont's Robert Cavanaugh told Chemfab representatives that Defendant DuPont decided to eliminate APFO in their homopolymer and FEP polymerization process because APFO accumulates in the body, is eliminated very slowly and has been shown to cause tumor growth in laboratory animals.

115. On March 17, 1995, Robert Cavanaugh had another meeting with Chemfab representatives. At that time, Mr. Cavanaugh informed Chemfab that Defendant DuPont's management issued a decree to remove APFO from its products because of its toxicity and long half-life.

116. In September of 1998, Mr. Cavanaugh made a presentation to Chemfab during which he discussed the reported health concerns surrounding exposure to PFOA, and Defendant DuPont's efforts to replace APFO in its dispersions with a chemical called FS-62.

117. In July of 1999, representatives of Chemfab Europe met with representatives of

ICI, another manufacturer of AFD located in Europe. During this meeting Chemfab was informed the Monkey Study was underway to determine the toxicity of PFOA in primates as well as the efforts by ICI to replace APFO in its AFD with a "green surfactant". A discussion also occurred regarding methods of destruction of PFOA released from AFD at customer facilities.

118. In July of 2000, Defendant DuPont and Chemfab began discussing a more comprehensive exchange of information about PFOA. Representatives from Chemfab traveled to Defendant DuPont's Washington Works facility in West Virginia in early 2001 for a series of meetings during which Defendant DuPont disclosed some of its information regarding PFOA toxicity and control of PFOA emissions.

119. In May of 2001, Defendant DuPont chemist Danielle Lindner met with Defendant SGPP representatives to discuss, among other things, Defendant SGPP's concerns about phasing out of APFO in AFD.

120. In August of 2002, Defendant SGPP closed its facility in North Bennington, Vermont and moved all of its fabric coating operations to Merrimack, New Hampshire.

121. In a memo dated October 16, 2002, Douglas Hayes of Defendant DuPont recounts discussions he had with Defendant SGPP representatives about APFO. In the memo, Hayes states "S-G acknowledged that we have been talking to them about C-8 issues a long time, we've been encouraging them to do a mass balance, etc." to determine the amount of APFO that was released into the environment.

122. In December of 2002, representatives of Defendant DuPont visited Defendant SGPP's facility in Merrimack to discuss testing methodologies that could be utilized to determine the amount of PFOA Defendant SGPP was releasing from its fabric coating ovens.

Up to this point, neither Chemfab nor Defendant SGPP had tested for PFOA emissions.

123. By early 2003, Defendant SGPP established a Stack Testing Team to plan for testing to determine how much PFOA was being released from its fabric coating ovens in Merrimack, New Hampshire. By late January of 2003, the name of this team changed to APFO Material Balance Team.

124. Up until approximately 2003, Defendant SGPP and its predecessor Chemfab routinely added Defendant 3M's product FC-143 (pure APFO) to some of its AFD formulations to improve the AFD's wetting properties. By April of 2003, Defendant SGPP stopped adding FC-143 to most of its formulations but continued to add it to some others.

125. In July of 2003, Defendant SGPP established a group to facilitate communications on the APFO/PFOA issue and assigned "Tymor" as a code name for the group to be used instead of referring in communications to the chemicals themselves.

126. In August of 2003, Defendant SGPP received a copy of a letter and attachment sent from Defendant 3M to EPA. The attachment contained information about APFO/PFOA including that PFOA was highly water soluble and that testing it did not degrade in the environment.

127. Also, in August of 2003, Defendant SGPP agreed to join a Processor Advisory Group to work with the Fluoropolymer Manufacturer's Group (FMG) of the Society for the Plastics Industry (SPI) to foster communications between manufacturers and processors concerning APFO hazards and regulation by the government.

128. In September of 2003, a briefing was provided to Defendant SGPP's parent company CEO in Evian, France by the Tymor team to update the parent company on the APFO/PFOA issue. In that presentation, PFOA air emissions were recognized as likely from the

dispersion coating process. At that meeting, the Processor Mass Balance Study, which was being sponsored by SPI and conducted by Barr Engineering, was discussed. This study was expected to quantify air, water, and solid PFOA emissions from dispersion processing at SGPP's Merrimack facility. There was also going to be PFOA emission testing at Defendant SGPP's fabric coating facility located in Kilrush Ireland.

129. In the 2003 presentation to management, the Tymor team explained that APFO was used in two of Defendant SGPP's divisions that involved millions of dollars of high-margin sales. The proposed plan was to follow a "Shadow" strategy to keep Defendant SGPP less visible to the media, customers, and public about the PFOA issue and "out of the public spotlight and allowed the company to "anonymously evaluate pathways and amounts of APFO released to the environment."

130. In December of 2003, Defendant SGPP received the results of Barr's mass balance emission testing of two coating towers at Merrimack, which were similar or identical to the coating towers formerly utilized in North Bennington. Barr's testing demonstrated that 8% of the APFO in the AFD was released into the air as PFOA for one tower and 11% for the other. This demonstrated conclusively that PFOA was not entirely destroyed when heated during the fabric coating process.

131. Several months later in early 2004, Defendant SGPP received the results of Barr's testing of a third coating process at its Merrimack facility. Specifically, it tested emissions from an oven heated with infrared radiation. That oven released 39% of the APFO in the AFD into the air as PFOA.

132. The Barr Processor Mass Balance Report was released by Barr in February of 2005. As per the study design, it did not identify the companies that participated in the testing,

only the results of the testing. Barr found that recirculating ovens such as those tested at Defendant SGPP's Merrimack facility released between 9 and 19% of the APFO in the AFD as PFOA into the air and the non-recirculating ovens such as the one tested later in Merrimack released between 39 and 54% of the APFO in the AFD as PFOA into the air.

133. On July 19, 2005, Ed Canning, Defendant SGPP's Global Director of Environment, Health and Safety, authored a memo to management to provide an update on the PFOA Fluorosurfactant Issue. In this memo, Canning references the finding by the EPA Scientific Advisory Board that PFOA was a likely human carcinogen. He also describes Defendant SGPP's "strategy relative to staying in the background on this issue," and recites concerns of the Tymor group that growing media interest in the PFOA topic may lead to the eventual connection to Defendant SGPP.

134. Defendant SGPP retained a consultant to perform PFOA air dispersion modeling at its fabric coating facility in Kilrush, Ireland. In October of 2005, it received the results of that study demonstrating that PFOA released into the air from its fabric coating operation, which was identical to the process formerly utilized in North Bennington, traveled through the air and was deposited in the communities surrounding the plant.

135. In accordance with its "Shadow" strategy, Defendant SGPP decided not to test the area around the Water Street Plant and, as a result, caused southern Bennington and Shaftsbury residents to be consume PFOA contaminated water for more than a decade before this testing was finally conducted.

136. In early March of 2016, as a result of the discovery of PFOA contamination in groundwater and potable water supply wells in North Bennington, the VTDEC, based on the recommendation of the Vermont Department of Health ("VTDOH"), set a Vermont drinking

water Health Advisory Limit ("VHAL")/interim groundwater enforcement standard for PFOA of 20 ppt, or 0.02 ppb. In December 2016, VTDEC adopted a final rule setting a permanent groundwater enforcement standard of 20 ppt.

**Knowledge of PFOA Environmental Contamination**

137. In 1966, Defendant DuPont became aware that perfluorochemicals including PFOA move rapidly in groundwater and migrate into nearby bodies of water.

138. By August 31, 1966, Defendant DuPont became aware that, without pretreatment, a small amount of perfluorocarboxylic acid (the class of pefluorochemicals to which PFOA belongs) dispersing agent, deposited in a landfill would be leached into the groundwater.

139. By May 13, 1975, Defendant DuPont employees in a memo entitled "Investigation of Current Teflon® Waste Disposal" stated: "The problems with disposing of 'Teflon' waste are fear of toxicity, either from 'Teflon' itself or additives in some products. Although fears of contamination of underground water supplies by 'Teflon' scrap may be exaggerated, the possibility of small amounts of undesirable materials such as 'Triton'® and C-8 being present does exist. For this reason, we have elected to not landfill 'Teflon' waste at the local landfill, where large quantities of underground water serving both the Plant and the surrounding area are present."

140. In 1982, Defendant DuPont knew that PFOA from its Washington Works facility was contaminating the Ohio River and could be present in drinking water that came from the Ohio River. An internal DuPont memo dated October 19, 1982 cited analysis and projections of estimated human PFOA exposure from drinking contaminated Ohio River water.

141. On November 23, 1982, Defendant DuPont's then Medical Director, Bruce Karth, MD, stated in an internal memorandum that "[t]here is obviously great potential for current or

future exposure of members of the local community from emissions leaving the Plant perimeter."

142. By 1984, Defendant DuPont was aware that PFOA in particulate form exhausted from stacks at its Washington Works plant was carried by the wind well beyond the Washington Works plant property line and deposited in the soil throughout the community. Defendant DuPont also learned that the drinking water supplies in communities around the Washington Works plant were contaminated with PFOA, presumably from air discharges from the plant of particulate matter that dissolved in rainwater and percolated into the groundwater and from direct discharges of liquids containing PFOA into the Ohio River.

143. By 1984, Defendant DuPont began a program of secretly collecting samples of tap water from public drinking water supplies near the Washington Works plant and testing these samples for PFOA. DuPont found that PFOA was present in drinking water samples collected from locations in both Ohio and West Virginia in the vicinity of its Washington Works facility in both Ohio and West Virginia.

144. By June of 1984, Defendant DuPont was aware that water supplied by the town of Little Hocking, Ohio, which was located "up-river" from the Washington Works plant contained PFOA levels of at least 500 ppt. Because of the location of the contaminated wells in Little Hocking upstream from the Washington Works facility, Defendant DuPont knew that these wells were contaminated by air emissions from Washington Works. Although Defendant DuPont knew that PFOA was persistent in the environment and that it was continuing to release PFOA into the air meaning that such releases would likely increase the PFOA contamination in Little Hocking's drinking water, Defendant DuPont chose not to alert local, state or federal officials or the public.

145. By 1985, Defendant DuPont was aware that PFOA was leaching into groundwater from onsite ponds where it has previously disposed of PFOA contaminated sludge and that the

PFOA was migrating through the groundwater into the public drinking water supply of Lubeck, West Virginia, where Defendant DuPont found PFOA levels as high as 1,500 ppt. These PFOA levels increased to 1,900 ppt in 1987 and 2,200 ppt in 1988.

146. By 1987, Defendant DuPont conducted air modeling at its Washington Works facility that documented PFOA in the ambient air beyond the fence line of the property and drifting with the wind into nearby communities confirming what it already knew from contamination of the Little Hocking wells.

147. On June 11, 1987, Dr. Karrh, Defendant DuPont's Medical Director, told DuPont officials that the Washington Works plant needed to give "highest priority" to issues associated with the presence of PFOA outside the boundaries of the plant.

148. In January of 1992, Defendant DuPont completed its purchase of the contaminated Lubeck wellfield. It then tested the new wells that were being used by the Lubeck community for drinking water and found that these wells had even higher levels of PFOA than the old wells, even though the new wells were two miles further away from the Washington Works plant. DuPont chose not to disclose its findings regarding the PFOA levels in the new Lubeck wells. The contamination of these wells was not made public until 2001 when the West Virginia Division of Environmental Protection tested the drinking water in Lubeck.

149. Defendants DuPont and 3M shared information about the environmental contamination potential of fluorochemicals, such as PFOA and PFAS, from as far back as the 1980s and the information alleged to be known by one was made known to the other.

150. It was determined that the contamination of groundwater used for drinking water by the communities surrounding Defendant DuPont's Washington Works Plant discovered in the early 1980s resulted principally from air emissions from DuPont's PTFE fine powder

manufacturing operations. PTFE fine powder and AFD were manufactured by Defendant DuPont from the same basic material, a dispersion containing water, PTFE particles, APFO and another surfactant. Fine powder was created by drying this dispersion. AFD was created by processing this dispersion by creating and removing a supernate, which reduces the amount of APFO in the final dispersion sold to customers.

151. Defendant DuPont learned by the mid-1980s that by heating the dispersion to dry and create fine powder, the APFO in the dispersion vaporized into PFOA and was released into the air where it fell out and contaminated groundwater. Defendant DuPont experimented with and later installed scrubbers to remove PFOA from the fine powder dryer exhaust and recycle it into APFO for reuse.

152. Although Defendant DuPont was aware that heating the dispersions above 150° C results in the release of PFOA into the air and that its AFD customers heated the dispersions above that temperature in their processes, Defendant DuPont never warned or advised its customers in its MSDS sheets or other product literature that this would occur.

**PFOA Drinking Water Limits**

153. In 2009, the EPA identified PFOA as an emerging contaminant of concern and issued a provisional health advisory stating that short term (weeks to months) exposure to PFOA at a concentration of 400 ppt can cause human health effects. The provisional health advisory stated that the discovery of PFOA in water above the advisory level should result in the discontinued use of the water for drinking or cooking.

154. Following the EPA's action, in 2013, New Jersey established a preliminary health-based guidance level of 0.04 ppb (40 ppt) in drinking water.

155. In 2016, Vermont established a drinking water advisory of 0.02 ppb (20 ppt).

156. In May 2016, the EPA replaced its 2009 provisional health advisory with a new lifetime health advisory. The 2016 lifetime health advisory established that the presence of PFOA in drinking water at a concentration greater than 70 ppt should require water systems to undertake remediation and public health officials to promptly notify consumers about the health risks associated with exposure to PFOA. The EPA health advisories are non-enforceable on the states. EPA also established a Reference Dose (RfD) of 0.000002 mg/kg/day. The Reference Dose is defined by EPA as an "estimate[] (with uncertainties spanning perhaps an order of magnitude) of the daily exposure to the human population (including sensitive subgroups) that is likely to be without an appreciable risk of deleterious effects during a lifetime." [3]

157. In June 2024, the EPA promulgated the PFAS/PFOA National Primary Drinking Water Regulation (NPDWR) Maximum Contaminant Level (MCL) of 4 ppt. It set the MCL Goal (MCLG), a non-enforceable health-based goal, of 0 ppt based on EPA's findings that these two compounds are likely carcinogenic in humans and in recognition of that the "latest science show[s] that there is no level of exposure to [PFOA and PFAS] without risk of health impacts."[4]

158. As of January 31, 2026, Vermont implemented a new Groundwater Protection Rule, setting its PFOA drinking water allowable level to 4 ppt.

159. In May 2026, the EPA upheld the PFOA MCL of 4 ppt.

**<u>The Town of Shaftsbury</u>**

160. The Town of Shaftsbury has a population of approximately 3,598 individuals and is located approximately 1.5 miles north of Defendant SGPP's facility in North Bennington.

---

[3] United States EPA, Health Effects Support Document for Perfluorooctanoic Acid (PFOA), p. 4-1 (May 2016).

[4] US EPA, *Final PFAS National Drinking Water Regulation* (April 2024), https://www.epa.gov/system/files/documents/2024-04/drinking-water-utilities-and-professionals-technical-overview-of-pfas-npdwr.pdf (last visited August 19, 2026).

161. The Town of Shaftsbury has 927 private residential wells.

162. Of the 927 private wells, 74 wells are less than 100 feet deep, making them more susceptible to contamination from air deposition of PFOA.

163. Dozens of private wells in the Town of Shaftsbury have tested positive for PFOA contamination and testing is ongoing.

164. Soil testing within the Town of Shaftsbury has revealed PFOA levels measured in soil above the Federal Regional Screening Level for residential use of 0.019 µg/kg.

**The Town of Bennington**

165. Residences located in southeast area of the Town of Bennington are not serviced by the Town of Bennington public water system and derive their drinking water from private wells.

166. Dozens of private wells in this region have tested positive for PFOA contamination and testing is ongoing.

167. Soil testing within the Town of Bennington has revealed PFOA levels measured in soil above the Federal Regional Screening Level of 0.019 µg/kg.

**SGPP Facilities' Background and Ownership History**

168. The VTDEC has identified Defendant SGPP's former manufacturing facility located at 1030 Water Street in North Bennington (the "Water Street Plant") as the source of PFOA contamination in the local groundwater aquifer and numerous private drinking water supply wells in and around Shaftsbury and southern Bennington.

169. The Water Street Plant was operated by Defendant SGPP and its predecessor Chemfab from approximately 1977 through 2002 and was engaged in the manufacture of Teflon® coated woven fiberglass fabrics. Defendant SGPP and its predecessor Chemfab utilized

perfluorinated chemical solutions containing PFOA in the manufacturing operations at the Water Street Plant.

170. Upon information and belief, Chemical Fabrics Corporation, then a Delaware corporation, began the manufacturing operations described herein at a facility located on Northside Drive in Bennington, Vermont (the "Northside Drive Plant") in or about 1969 under the trade name "Chemfab."

171. PFOA contamination has been found in the local groundwater aquifer and private drinking water supply wells around the Northside Drive Plant.

172. In late 1977, Chemical Fabrics Corporation moved its manufacturing operations from the Northside Drive Plant in Bennington to the Water Street Plant in North Bennington.

173. In December of 1983, Chemical Fabrics Corporation acquired legal title to the property on which the Water Street Plant is situated via property transfer from the Bennington County Industrial Corporation.

174. In November of 1991, Chemical Fabrics Corporation adopted Chemfab Corporation as its legal name. In 1999, Chemfab's sales were over $126 million.

175. Upon information and belief, Defendant SGPP's predecessor Chemfab worked closely with Defendants DuPont in the use of PFOA-containing solutions for coating fabrics, including roofing fabrics, at the Northside Drive Plant and Water Street Plant.

176. In or about August of 2000, Defendant Saint-Gobain acquired Chemfab for $171 million through a Merger Agreement by which Norton Company, a wholly owned subsidiary of Defendant SGPP, purchased all of Chemfab's outstanding shares of stock and options, and assumed its net financial debt.

177. As a result of the 2000 Merger Agreement, Defendant SGPP assumed any and all

liabilities of Chemfab, including any and all liabilities related to or arising out of Chemfab's manufacturing operations in Vermont, including at the Northside Drive Plant and Water Street Plant.

178. Following the acquisition of Chemfab, Defendant SGPP continued the manufacturing operations described herein at the Water Street Plant in North Bennington. As of May 2001, SGPP became record owner of the property on which the Water Street Plant is situated.

179. In July of 2001, Defendant SGPP announced that it would close the Water Street Plant by August of 2002, eliminating approximately 90 jobs. This decision was due, in part, to SGPP's desire to avoid compliance with Vermont's air pollution regulatory standards.

180. Defendant SGPP planned to move the Water Street Plant's manufacturing operations to other locations, including Merrimack, New Hampshire, as Vermont required certain emissions abatement equipment to reduce and clean-up air emissions that was not required in New Hampshire, making New Hampshire a more attractive regulatory market for SGPP manufacturing operations.

**SGPP Facilities' Operations and PFOA Use/Disposal**

181. Chemfab began AFD coating operations at a facility located on Northside Drive in Bennington in or about 1969. The fabric coating operations were relocated to a larger facility located on Water Street in North Bennington in 1978 and expanded.

182. The Teflon®-coated woven fabrics manufactured by Defendant SGPP at the SGPP Facilities were used in a wide variety of commercial and industrial applications, including as roofing material for large structures such as dome roofs, laminate substrate for circuit boards, and cooking sheets.

183. Defendant SGPP's manufacturing operations at the Water Street Plant consisted primarily of the application of Teflon® coatings to fiberglass fabrics in up to 13 coating lines, where the fabrics were dip coated in AFD (Teflon®) containing APFO.

184. The coated fiberglass was then pulled through a fabric coating oven (tower) which had three separate heating zones. The first zone, referred to as the drying zone, had temperatures ranging from 30-100° C where the water in the AFD evaporated into water vapor and was exhausted out of the oven. In the drying zone, APFO in the AFD began to sublimate into PFOA vapor and was exhausted out of the oven. The second zone, referred to as the baking zone, had temperatures ranging from 200-300° C and the remaining APFO in the AFD sublimated to PFOA and was exhausted out of the oven together with the other surfactant in the AFD, Triton-X. The final zone, referred to as the sintering zone, had temperatures ranging from 370-420° C where the PTFE particles in the AFD were then fused to the fiberglass cloth creating the final product. The exhaust from each vertical oven was released into the air through each zone of the coating line's tower, releasing PFOA vapor into the atmosphere.

185. Upon information and belief, Defendant SGPP also operated ovens (towers) that coated APFO-containing FEP dispersions onto fabric. FEP dispersions could not be sintered, and thus, these coatings were processed in ovens that did not utilize a sintering zone. When FEP dispersions were heated, they released PFOA vapor into the air in a similar fashion to other AFD as described above.

186. As the PFOA vapors cooled, the PFOA returned to its solid phase as fine particulate matter and was carried by the wind until precipitating out of the air either through precipitation or gravity and deposited on the soils within the Town of Shaftsbury, the Town of Bennington and beyond.

187. Once the PFOA particulate matter reached the soil, it dissolved into rainwater or snow melt and was carried down to the groundwater where it has remained and will remain because PFOA does not degrade in the environment.

188. Some of the ovens (towers) at the Water Street Plant were equipped with abaters, which were thermo-catalytic control devices. Defendant SGPP and its predecessor Chemfab never tested these devices for efficiency of removing PFOA vapors from exhaust and these devices were not designed or intended for PFOA removal from exhaust.

189. Defendant SGPP's manufacturing operations at the Water Street Plant resulted in at least 30 air quality complaints to the VTDEC's Air Pollution Control Division between 1977 and 2000. Most of these complaints pertained to noxious odors released from the Plant, while others dealt with large amounts of smoke and/or visible emissions from the Plant.

190. Defendant SGPP's manufacturing operations at the Water Street Plant resulted in multiple enforcement actions brought by the VTDEC's Air Pollution Control Division against Defendant SGPP due to odors and/or other issues related to the Plant's air emissions.

191. In addition to its air emissions, Defendant SGPP routinely discharged wastewater that contained PFOA, derived from removing AFD from equipment, AFD spills, and rinsing of AFD containers, into floor drains throughout the SGPP Facilities. Surplus AFD that contained PFOA were put into barrels and compacted outside the Water Street Plant, resulting in discharges onto the ground and into nearby Paran Creek. Defendant SGPP and its predecessor also discharged wastewater containing PFOA through one or more pipes to the exterior of the SGPP Facilities, which also flowed onto the ground and into nearby waterways. These various discharges of PFOA into the environment resulted in contamination of the soil, surface water, and groundwater around the SGPP Facilities.

192. Throughout the operation of the SGPP Facilities, Defendant SGPP never tested air emissions or wastewater emissions for PFOA.

193. Upon information and belief, due to inadequate and unsafe practices related to the handling, cleanup, and/or disposal of PFOA by Defendants at the SGPP Facilities, Defendant SGPP and its predecessor emitted, leaked, spilled, dumped, released, or otherwise discharged PFOA from these facilities into soil, sediments, groundwater, and/or surface waters, thereby causing environmental contamination around the facilities, including the contamination of the local groundwater aquifer and numerous private drinking water supply wells.

**Discovery of PFOA Contamination by the VTDEC**

194. In early February 2016, in response to the discovery of PFOA contamination from a SGPP facility in nearby Hoosick Falls, New York, the VTDEC sampled private drinking water wells and two commercial wells near the site of the Water Street Plant in North Bennington for the presence of perfluorinated chemicals. All five of the wells were found to contain PFOA at levels above VHAL of 20 ppt.

195. Based on these sampling results, the VTDEC, in early March of 2016 developed an initial sampling plan of all private drinking water wells and water sources, including surface water and sediments, within a 1.5-mile radius of the Water Street Plant. The State of Vermont also provided bottled water to all residents within this 1.5-mile radius until all impacted water sources could be determined.

196. As part of this initial sampling plan, VTDEC sampled approximately 180 private drinking water wells within a 1.5-mile radius of the Water Street Plant. The analytical results from this sampling showed that approximately 116 of these wells were contaminated with some level of PFOA contamination, and that approximately 105 of these wells were contaminated with

levels of PFOA in excess of 20 ppt.

197. In early March 2016, the VTDEC notified Defendant SGPP that it was likely responsible for the PFOA contamination around the Water Street Plant and formally requested that Defendant SGPP commit to a series of actions to address the resulting threat to public health, welfare, and the environment.

198. In mid-March of 2016, based on the results of the initial sampling plan, the VTDEC expanded its sampling of private drinking water wells into three areas outside the original 1.5-mile radius around the Water Street Plant. Of the approximate 50 wells sampled in these three expanded areas, 28 wells contained some level of PFOA contamination, and 19 of these wells contaminated with levels of PFOA in excess of 20 ppt. Furthermore, five monitoring wells at the Bennington Landfill showed levels of PFOA contamination between 18 ppt and 140 ppt.

199. In early April 2016, the VTDEC again expanded the sampling area and announced that it would be conducting "spot check" samples outside of this expanded area including near Shaftsbury.

200. In late April 2016, the VTDEC again expanded the sampling area to include additional areas around the Northside Drive Plant as well as areas around the Kocher Drive Dump.

201. Between February and mid-April of 2016, the VTDEC sampled approximately 232 private drinking water wells for PFOA contamination, and of these wells, approximately 126 wells showed levels of PFOA contamination above the VHAL of 20 ppt.

202. By mid-April 2017, the VTDEC had sampled approximately 570 private drinking water wells for PFOA contamination, and of these wells, 276 showed levels of PFOA

contamination above the VHAL of 20 ppt.

203. On April 13, 2016, the Vermont Agency of Natural Resources ("ANR"), based on its findings that PFOA is toxic, persistent in the environment, causes and contributes to adverse chronic health effects, and is a suspected carcinogen, adopted an emergency rule classifying PFOA as a hazardous waste under Vermont Hazardous Waste Management regulations. The rule became permanent in December 2016.

204. In late April 2016, the DOH, in conjunction with the Centers for Disease Control ("CDC"), as part of the State's response to the PFOA contamination of private drinking water wells, began to fund blood testing of North Bennington and Bennington residents whose drinking water wells have shown the presence of elevated levels of PFOA.

205. In 2016, a class action lawsuit was filed in this Court, *Sullivan et al. v. Saint-Gobain Performance Plastics Corp.*, No. 5:16-cv-00125-gwc, arising from the PFOA contamination discovered in Bennington and North Bennington. That litigation resulted in a Court-approved class settlement in 2022, which addressed PFOA contamination identified through 2016–2017 sampling. No prior litigation addressed contamination subsequently discovered beginning in 2023 in the Town of Shaftsbury and in the Town of Bennington outside of the original "contamination area" identified in the *Sullivan* litigation.

206. In May 2019, the Vermont Legislature enacted a law that required statewide sampling and monitoring for PFAS contamination. Pursuant to this law, in June 2019, Vermont issued a PFAS Statewide Sampling Plan.

207. In 2023, the VTDEC began well testing in areas around Shaftsbury and southern Bennington as part of the sampling of 500 randomly selected private wells throughout Vermont. This sampling indicated the presence of PFOA in several private drinking water wells, which

prompted the VTDEC to perform confirmatory sampling, and install POETs on impacted wells.

208. Between late 2023 and 2025, follow-up sampling was performed to further characterize the zone of PFOA contamination. It showed extensive contamination in Shaftsbury and southeastern Bennington outside the contamination area designated in the certification of the Settlement Class in *Sullivan* with private wells in excess of 20-70 ppt of PFOA, many times the State and Federal allowable limit of 4 ppt.

209. A 2025 Bennington College Community Research Report examining the VTDEC's water sample dataset from 698 individual private wells in the region revealed increased levels of PFOA between 2016 and 2024, indicating that contamination is increasing over time.

210. On March 25, 2025, the VTDEC wrote to Defendant SGPP identifying it as a responsible party for the recently discovered contamination in Shaftsbury and southern Bennington in the "2025 Areas of Concern" and outlining future testing and corrective actions needed to address the contamination.

211. Plaintiffs and Class Members whose wells have been contaminated with PFOA above the 2026 Vermont Groundwater Protection Limit of 4 ppt have been advised not to use their well water for drinking or cooking purposes and are forced to rely on bottled water and filtration systems.

212. Plaintiffs and Class Members whose private drinking water wells have been contaminated with PFOA have also suffered soil contamination in addition to the ground water contamination on their property.

213. As a result of the ground water and soil contamination, Plaintiffs and Class Members have suffered diminution of property value.

214. As a result of the ground water contamination, Plaintiffs and Class Members have been required to use bottled water and/or Point of Entry Treatment Systems and have suffered annoyance, upset, and aggravation and inconvenience.

215. As a result of the contamination of their private drinking water supply wells with PFOA, Plaintiffs and Class Members have consumed and ingested PFOA over many years, with deleterious long-term physiologic alterations and damage to their blood, liver, kidneys, immune system, and other organs.

216. The allegations in this complaint arise exclusively from PFOA emissions and discharges from the SGPP Facilities' AFD coating operations.

## CLASS ACTION ALLEGATIONS

217. Plaintiffs incorporate the foregoing paragraphs as though the same were set forth at length herein.

218. Plaintiffs bring this action pursuant to the provisions of Rule 23(a), 23(b)(2), and (b)(3) of the Federal Rules of Civil Procedure as a class action on their own behalf and on behalf of other persons similarly situated. This action satisfies the numerosity, commonality, typicality, predominance, and superiority requirements of Fed. R. Civ. P. 23(a) and 23(b).

219. Plaintiffs bring this class action on behalf of the following classes, as set forth below:

a. **Property Devaluation and Groundwater Protection Act Class for Drinking Water Contamination**

All individuals who are or were owners of real property located in the Town of Shaftsbury and/or Town of Bennington that was supplied with drinking water from a private well contaminated with PFOA, who owned that property at the time the contamination of the property's private well was discovered whose property value has been reduced due to the presence of PFOA in their drinking water;

b. **Property Devaluation Class for Soil Contamination**

All individuals who are or were owners of real property located in the Town of Shaftsbury

and/or Town of Bennington that was contaminated with PFOA without contamination yet being discovered in the drinking water of such property, who owned that property at the time this lawsuit was commenced;

c. **Nuisance**

All individuals who resided at real property located in the Town of Shaftsbury and/or Town of Bennington that was supplied with drinking water from a private well contaminated with PFOA, and who resided at that property at the time the contamination of the property's private well was discovered through a water test.

d. **Medical Monitoring Class**

All individuals who resided and ingested tap water for at least six months at a property located in the Town of Shaftsbury and/or Town of Bennington that was supplied with drinking water from a private well contaminated with PFOA, and who have suffered an accumulation of PFOA in the bodies as demonstrated by blood serum tests disclosing a PFOA level in their blood at or above 2.00 ug/L; or any natural child birthed by an individual who meets and/or met this criteria at the time of the child's birth and whose blood serum was tested after birth disclosing a PFOA level at or above 2.0 µg/L.

220. Excluded from the Classes are:

a. Defendants and any entities in which a Defendant has a controlling interest, and their legal representatives, officers, directors, successors, or assigns;

b. The Judge to whom this case is assigned and the Judge's staff;

c. Any attorneys, or their immediate family, representing Plaintiffs or Members of the proposed Class;

d. Any State or any of its agencies;

e. The Town of Shaftsbury;

f. The Town of Bennington;

g. The Village of North Bennington;

h. All persons who otherwise would be included under one or more of the class descriptions, but who have filed a lawsuit for manifest personal injury for PFOA-related illness related to exposure to contaminated water;

i. All persons who qualified for benefits under the Class Action Settlement

in *Sullivan v. Saint-Gobain*, Case No. 5:16-cv-00125-gwc (D. Vt. Apr. 18, 2022) (ECF 481) (Final Order of Approval).

j. All persons or entities that properly execute and timely file a request for exclusion from the Class;

221. Plaintiffs reserve the right to amend the Class definitions set forth above if, prior to the Court's determination on whether certification is appropriate, discovery and/or further investigation reveals that any Class should be expanded, divided into subclasses, or modified in any way.

**Numerosity**

222. Although the exact number of class members is uncertain and can be ascertained only through appropriate discovery, the number is great enough such that joinder is impracticable. Indeed, there are approximately 250 private wells in the Town of Shaftsbury and many more private wells in the Town of Bennington whose owners were ineligible for benefits under the *Sullivan* Final Order of Approval, and there are hundreds of individuals who resided at properties utilizing such wells for drinking water and who have consumed contaminated drinking water. Since 2023, approximately 25 wells in Shaftsbury and 100 wells in southern Bennington have tested positive for PFOA. Testing coordinated by the State of Vermont remains ongoing. Each of the classes set forth above is sufficiently numerous to warrant class treatment, and the disposition of the claims of these class members in a single action will provide substantial benefits to all parties and to the Court.

**Typicality**

223. Plaintiffs' claims are typical of the claims to be advanced by Members of the Classes, and their claims encompass those of the other Class Members in each class, in that the

facts and circumstances giving rise to liability are the same, the claims are based on the same legal theories, and the damages suffered by the Plaintiffs are the same kinds of damages suffered by the Members of the Classes.

224. Moreover, the factual bases of Defendants' misconduct are common to all Members of the Classes and represent a common thread of misconduct resulting in injury to all members of the classes.

**Adequate Representation**

225. Plaintiffs will fairly and adequately represent and protect the interests of the Classes, as their interests do not conflict, their interests are co-extensive with common rights of recovery based on the same essential facts and legal theories, they are members of the same communities, they are similarly damaged and are seeking the same remedies, and they intend to prosecute this action vigorously.

226. Plaintiffs have retained counsel with substantial experience litigating both environmental torts and class actions, including actions, like this one, representing putative classes whose property has been devalued by the actions of a polluter and/or who have been exposed to dangerous chemicals and are in need of biomonitoring, including *Sullivan v. Saint-Gobain*, Case No. 5:16-cv-00125-gwc (D. Vt. Apr. 18, 2022) and *Baker v. Saint-Gobain Performance Plastics, et al.*, 16-cv-0917 (N.D.N.Y).

**Predominance of Common Questions**

227. Plaintiffs bring this action under Rule 23(b)(3) because there are numerous questions of law and fact common to Plaintiffs and the class members that predominate over any question affecting only individual class members. The answers to these common questions will advance resolution of the litigation as to all class members. These common legal and factual

issues include:

a. Whether Defendant SGPP owed a duty to Plaintiffs and members of the classes to refrain from conduct reasonably likely to cause contamination of class members' drinking water;

b. Whether Defendant SGPP knew or should have known that it was unreasonably dangerous to release PFOA into the environment during its operation of fabric coating facilities in North Bennington, Vermont;

c. Whether Defendant SGPP knew or should have known that releasing PFOA in the manner alleged herein was reasonably likely to cause contamination of class members' properties and drinking water;

d. Whether Defendant SGPP breached a legal duty to Plaintiffs and the classes by releasing PFOA in the manner described herein;

e. Whether Defendant SGPP's breach of a legal duty caused class members' properties and drinking water to become contaminated with PFOA;

f. Whether it was foreseeable that Defendant SGPP's use of PFOA would cause class members' properties and drinking water to become contaminated;

g. Whether Defendant SGPP owed a duty to Plaintiffs and Members of the Class to prevent and/or minimize any discharge or release of PFOA into the surrounding environment;

h. Whether Defendant SGPP knew or should reasonably have known that the failure to have policies or procedures regarding the proper handling, cleanup, or disposal of PFOA would result in contamination to

groundwater and soil and cause damages to Plaintiffs and Members of the Class;

i. Whether it was reasonably foreseeable to Defendant SGPP that the discharge or release of PFOA into the environment would result in contamination of groundwater and soil and cause damages to Plaintiffs and Members of the Class;

j. Whether Defendant SGPP should have advised residents and state and local authorities that soil and drinking water in the Towns of Shaftsbury and Bennington was likely contaminated with PFOA after testing by Barr Engineering as part of the Processors Mass Balance Study of fabric-coating ovens in Merrimack, New Hampshire identical to those used by SGPP in North Bennington prior to the closing of these facilities definitively demonstrated that coating fabric and other substates with AFD in such ovens released PFOA into the air;

k. Whether Defendants DuPont and 3M knew or should have known that their PFOA and PFOA-containing products posed a risk to the environment and health of people living in or near the communities where these products were used, such as the Towns of Shaftsbury and Bennington;

l. Whether Defendants DuPont and 3M failed to adequately warn of the health and environmental hazards potentially caused by the anticipated use of their PFOA-containing products, specifically the heating of AFD to a temperature sufficient to cause sublimation of APFO into PFOA

vapor but insufficient to cause a decarboxylation of such PFOA molecules resulting in their release into the environment;

m. Whether Defendants DuPont and 3M failed to provide adequate instructions regarding technologies that could reduce or eliminate the PFOA emissions for AFD coating manufacturing facilities and/or that PFOA could be replaced in AFD dispersions with another surfactant.

n. Whether Defendants DuPont and 3M breached their continuing duty to warn of dangers of their products discovered after manufacture and sale;

o. Whether Plaintiffs and the classes are at increased risk of illness and harm as a result of the PFOA accumulation they have sustained in their bodies as a result of drinking and cooking with PFOA contaminated private well water;

p. Whether biomonitoring and surveillance is reasonable and necessary to assure early diagnosis and treatment of PFOA-related illnesses and conditions;

q. Whether early diagnosis and treatment of the conditions caused by PFOA will be beneficial to Plaintiffs and the Medical Monitoring Class;

r. Whether Defendants' contamination of the groundwater in the Towns of Shaftsbury and Bennington with toxic PFOA constitutes unreasonable harm to groundwater through the alteration of its character or quality in violation of Vermont's Groundwater Protection Act, 10 V.S.A. § 1410(c); and

s. Whether the contamination of the drinking water and/or soil of the

properties owned by the class members caused a reduction in their resale value;

t. Whether Defendants' conduct was intentional, reckless or grossly negligent warranting the imposition of punitive damages.

**Superiority**

228. Plaintiffs and members of the classes have all suffered and will continue to suffer harm and damages as a result of Defendants' unlawful and wrongful conduct. A class action is superior to the other available methods for the fair and efficient adjudication of this controversy.

229. Absent a class action the cost of litigating their individual class member's claims would be prohibitively high and, therefore, deprive them of any effective remedy at law. Further, without class litigation, class members will continue to incur damages.

230. Class treatment of common questions of law and fact will conserve the resources of the courts and the litigants, and will promote consistency and efficiency of adjudication.

**Fed. R. Civ. P 23(a) and 23(b)(2) Injunctive or Declaratory Relief**

231. In addition to the above, Plaintiffs bring this Class action under Fed. R. Civ. P. 23(a) and 23(b)(2), because Defendants have acted or refused to act on grounds that apply generally to the Classes, such that final injunctive relief or declaratory relief is appropriate with respect to each Class as a whole. Such injunctive relief includes, but is not limited to, an injunction to require a medical monitoring program sufficient to monitor class members' health to ensure they are adequately protected from the deleterious effects and potentially-deleterious of PFOA on the human body and to detect and remedy these effects to the extent possible, and equitable relief pursuant to the Vermont Groundwater Protection Act, 10 V.S.A. § 1410(c).

232. Accordingly, Plaintiffs seek an injunction requiring the Defendants to implement

a medical monitoring program to aid the Medical Monitoring Class pursuant to 12 V.S.A. § 7202;

233. Finally, the Plaintiffs and the class seek a declaration that Defendants acted with negligence, gross negligence, and/or willful, wanton, and careless disregard for the health and safety of the lives of Plaintiffs and members of the class.

**Fed. R. Civ. P. 23(a) and 23(c)(4) Certification of Particular Issues**

234. In the alternative to certification under Rule 23(b)(2) or 23(b)(3), Plaintiffs and the classes seek to maintain a class action with respect to particular issues under Rule 23(c)(4).

235. Specifically, Defendants' liability is suitable for issue certification under Rule 23(c)(4).

## CAUSES OF ACTION

## COUNT I: NEGLIGENCE

236. Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraph of this Complaint as if they were set forth at length herein.

237. Defendants knew or should have known that PFOA-containing AFD that were used in the manufacturing processes at Defendant SGPP's Facilities would result in the release into the environment of PFOA, the contamination of soil and groundwater, ingestion of that groundwater by the communities of Shaftsbury and Bennington, accumulation of PFOA in the bodies of members of those communities, including Plaintiffs, and potential adverse health effects to those people, including Plaintiffs.

238. Defendants knew or should have known that use of PFOA, PFOA-containing AFD dispersions and/or the discharge of PFOA into the air, ground, and sewer system was potentially hazardous to human health and the environment and required Defendants to take

adequate safety precautions to ensure that PFOA was not released into the surrounding environment.

239. Defendants further knew or should have known that it was unsafe and/or unreasonably dangerous to wash out and/or discharge into the environment the AFD residue from the manufacturing equipment where PFOA-containing AFD was used.

240. Defendants further knew or should have known that it was unsafe and/or unreasonably dangerous to permit PFOA vapor and particulate matter to exit from stacks at the facility without adequate control measures.

241. During some of the years of operation of the Defendant SGPP Facilities, defendants 3M and DuPont failed to share information and knowledge that these companies had and to provide adequate warnings and instructions to Defendant SGPP about the hazards of PFOA to the environment and to the safety of the community.

242. At some point in time after the use of PFOA and PFOA-containing AFD at Defendant SGPP's Facilities began, either based upon information provided by defendants 3M and DuPont, through the testing done by Barr Engineering at SGPP's Merrimack Facility, or through published and available literature, Defendant SGPP knew or should have known of the environmental risks and health hazards associated with exposure of human beings to PFOA.

243. Defendants 3M and DuPont had a continuing duty to warn purchasers of their PFOA and PFOA-containing products of risks and hazards learned by such defendants after sale of these products.

244. Defendant SGPP had a duty to exercise due and reasonable care in its use, handling, disposal and discharge of PFOA and PFOA-containing PTFE dispersions to prevent or minimize any discharge or release of PFOA into the surrounding environment, including into the

air, soils, groundwater.

245. Defendant SGPP knew or reasonably should have known that the use of PFOA in its manufacturing processes and/or the discharge or release of PFOA into the environment required adequate safety precautions to ensure that PFOA was not released into the surrounding environment.

246. Defendant SGPP breached the above-stated duties by unreasonably releasing or disposing of PFOA-containing dispersions and/or releasing PFOA in a manner that guaranteed PFOA would enter the environment, including the soil and groundwater, and be ingested by residents, including Plaintiffs.

247. Defendants 3M and DuPont had a duty to warn users of their PFOA products of the dangers of releasing PFOA into the environment and breached that duty by failing to disclose information they possessed about the health hazards associated with PFOA exposure, the propensity of PFOA to cause environmental contamination of soil and drinking water, and the bioaccumulation of PFOA in people ingesting such contaminated drinking water.

248. Defendants 3M and DuPont further breached their continuing duties to warn about the dangers of PFOA learned after the manufacture and sale of their PFOA and PFOA-containing products to Defendant SGPP.

249. Defendants 3M and DuPont breached the above-stated duties by failing to adequately warn and provide sufficient instructions to foreseeable users of the products including employees handling and disposing of the products at Defendant SGPP's Facilities, and to avoid discharging PFOA into the environment where it was likely to enter the soil and groundwater and be ingested by residents such as plaintiffs.

250. Had Defendants DuPont and 3M provided adequate warnings and instructions of

the known health hazards and risk of environmental contamination of PFOA and their PFOA-containing products to purchasers, users, governmental agencies, and the public, it is more likely than not that Plaintiffs' injuries and damages would not have occurred or would have been lessened as actions would have been taken to reduce or eliminate Plaintiffs' exposure to PFOA before toxic accumulation in the body and environment occurred.

251. Defendant SGPP also breached its duty to advise residents and state and local authorities of the likelihood that soil and drinking water in the Town of Shaftsbury and Town of Bennington was likely to be contaminated with PFOA after testing of fabric-coating ovens in Merrimack, New Hampshire identical to those used by Defendant SGPP in Bennington and North Bennington prior to the closing of these facilities in 2003 by Barr Engineering definitively demonstrated that such ovens released PFOA into the air.

252. As a result of Defendants' breaches of the various duties set forth above, the soil and drinking water in and around Shaftsbury and Bennington became contaminated with unsafe levels of PFOA, which was ingested by Plaintiffs.

253. Upon information and belief, Defendants 3M and DuPont were grossly negligent, acted with reckless indifference to the health and safety of the public and/or intentionally failed to make public or provide to purchasers of their products information these defendants possessed about the potential danger and harm that accumulation of PFOA in the human beings resulting from discharge of PFOA into the environment could cause.

254. Upon information and belief, Defendant SGPP was grossly negligent, acted with reckless indifference to the health and safety of the public, and/or intentionally failed to prevent PFOA from being discharged into the environment and in failing to inform the public in general of the potential that PFOA was contaminating its private water supply.

255. As a direct and proximate result of Defendants' conduct described herein, PFOA was deposited in soil and groundwater in the Towns of Shaftsbury and Bennington, contaminating soil and private drinking water wells, including those of Plaintiffs and Class Members, above the applicable state and federal levels.

256. As a direct and proximate result of Defendants' actions and omissions described herein, Plaintiffs have suffered injuries to person and property caused by the release of PFOA into the environment, contamination of soil and groundwater, and accumulation of PFOA into their bodies, entitling them to compensatory and consequential damages, including the cost of future medical monitoring.

**COUNT II: PRIVATE NUISANCE**

257. Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if they were set forth herein.

258. Defendants' intentional acts and omissions relating to its use, handling, discharge, and/or disposal of PFOA, has contaminated Plaintiffs' and Class Members' properties and/or private drinking water supply wells with PFOA, thereby unreasonably and substantially interfering with Plaintiffs' and Class Members' property rights, privileges, and use and enjoyment of property so as to constitute a private nuisance.

259. As a direct and proximate result of Defendants' creation and maintenance of a private nuisance, Plaintiffs and Class Members have suffered damages in the form of real property damage, out-of-pocket expenses, personal property damage, loss of use and enjoyment of property, diminution in property value, the necessity for long-term medical monitoring, annoyance, upset, aggravation and inconvenience, for which Defendant Saint-Gobain is liable in damages and equitable relief, including but not limited to, injunctive relief requiring abatement

of the nuisance through remediation of contaminated groundwater and soils.

**COUNT III: TRESPASS AGAINST DEFENDANT SGPP**

260. Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if they were set forth herein.

261. Defendant SGPP's intentional acts or omissions in its use handling, discharge and/or disposal of PFOA and PFOA-containing AFD has proximately caused PFOA to enter onto the property of the Plaintiffs and Class Members, resulting in the contamination of Plaintiffs' and Class Members' premises, thereby affecting Plaintiffs' and Class Members' interest in the exclusive possession of their property.

262. Defendant SGPP knew or had substantial certainty that its acts or omissions alleged herein could result in PFOA entering and remaining on Plaintiffs' and Class Members' properties.

263. As a direct and proximate result of Defendant SGPP's trespass, Plaintiffs and Class Members have suffered damages in the form of real property damage, out-of-pocket expenses, personal property damage, loss of use of enjoyment of property, diminution in property value, the necessity for long-term medical monitoring, annoyance, upset, aggravation, and inconvenience, for which Defendant SGPP is liable in damages.

**COUNT IV: STRICT PRODUCTS LIABILITY—FAILURE TO WARN AGAINST DEFENDANTS DUPONT AND 3M**

264. Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if they were set forth herein.

265. From the 1950s through approximately 2000, Defendant 3M developed, tested, assembled, manufactured, packaged, labeled, prepared, distributed, marketed, and/or supplied for sale and sold APFO to Defendant DuPont, to other manufacturers of AFD, and directly to

Defendant SGPP in the ordinary course of their business.

266. From the 1950s through 2002, Defendant DuPont developed, tested, assembled, manufactured, packaged, labeled, prepared, distributed, marketed, and/or supplied for sale and sold AFD containing APFO to Defendant SGPP in the ordinary course of their business.

267. By at least 1984, Defendants DuPont and 3M were aware of the health hazards associated with PFOA exposure as well as the potential for PFOA to contaminate soil and drinking water. Both defendants were also aware that there were technologies that could reduce or eliminate the PFOA emissions for AFD coating manufacturing facilities and/or that PFOA could be replaced in AFD with another surfactant. Both Defendants DuPont and 3M chose to continue to sell APFO and APFO-containing dispersions without advising purchasers that processing AFD containing APFO would release PFOA into the air, of the true hazards of PFOA to human health and the environment or instruct them about and recommend emission reducing technologies because of concerns for loss of profits to these Defendants.

268. Upon information and belief, Defendant SGPP utilized the APFO and APFO-containing AFD products supplied by defendants DuPont and 3M in a reasonably foreseeable and intended manner for such products' intended use.

269. The APFO and APFO-containing AFD products sold by Defendants DuPont and 3M to Defendant SGPP were unreasonably dangerous to residents living in the communities near the SGPP Facilities, including Plaintiffs, without adequate warnings and instructions to prevent discharge of PFOA into the environment contamination of the soil and groundwater, and toxic accumulation inside of the bodies of residents, including Plaintiffs.

270. Defendants DuPont and 3M knew or should have known that the APFO and APFO-containing AFD products they sold to Defendant SGPP would result in the into the

environment of PFOA and cause contamination of the soil and water supply and toxic accumulation of PFOA in the blood serum of residents living in the communities where their products were used, including Plaintiffs.

271. Defendants DuPont and 3M had actual knowledge of the health hazards associated with PFOA ingestion through both animal studies conducted by researchers and contractors they employed and through experience with their own workers, but, upon information and belief, failed to communicate such information to relevant governmental agencies, or to foreseeable users of the materials, including employees handling and disposing of them at the SGPP Facilities.

272. Defendants DuPont and 3M also failed to warn and alert purchasers and users or the public of their discoveries of extensive soil and groundwater contamination in communities near their Washington Works (DuPont) and Cottage Grove (3M) facilities once these water supplies were determined to be contaminated with PFOA or other similar fluorochemicals produced by 3M.

273. Defendants DuPont and 3M failed to provide adequate instructions and warnings when their APFO and APFO-containing products were sold and accordingly sold such products that were unreasonably dangerous for their intended use and defective making them strictly liable for the injuries and damages sustained by Plaintiffs.

274. Defendants DuPont and 3M breached their continuing duty to warn of defects in their products after learning of the extensive environmental contamination caused by PFOA in or near their facilities and failing to provide this information to purchasers, users, and others who could be adversely affected.

275. Had Defendants DuPont and 3M provided adequate warnings and instructions of

the known health hazards and risk of environmental contamination of PFOA released from their APFO-containing products to purchasers, users, governmental agencies and the public, it is more likely than not that Plaintiffs' injuries and damages would not have occurred or would have been lessened as actions would have been taken to reduce or eliminate Plaintiffs' exposures to PFOA and the contamination of the communities around the SGPP Facilities.

276. Defendants DuPont and 3M acted with reckless indifference to the health and safety of workers using their APFO and APFO-containing AFD products and residents in and near the communities where these products were used, including Plaintiffs, by failing to provide adequate warnings that use of these products would produce PFOA emissions and of the known dangers of PFOA when discharged into the environment and inhaled and ingested by nearby residents, such as Plaintiffs.

277. As a direct and proximate result of the sale of Defendants DuPont and 3M's defective APFO and APFO-containing products lacking proper warnings and instructions, Plaintiffs have suffered toxic invasions of their bodies, contamination of their properties and drinking water, and other damages, both economic and non-economic.

278. As a direct and proximate result of the sale of Defendants DuPont and 3M's APFO and APFO-containing AFD products lacking proper warnings and instructions, Plaintiffs are entitled to consequential damages covering the cost of medical monitoring and surveillance for other illnesses that may develop as a result of their exposure to and accumulation of PFOA in their bodies.

**COUNT V: VIOLATION OF THE VERMONT GROUNDWATER PROTECTION ACT (10 V.S.A. §§ 1390 *et seq.* and 1410)**

279. Plaintiffs hereby incorporate by reference the allegations contained in the

preceding paragraphs of this Complaint as if they were set forth herein.

280. Pursuant to the Vermont Groundwater Protection Act, 10 V.S.A. § 1390 et seq., "all persons have a right to the beneficial use and enjoyment of groundwater free from unreasonable interference with other persons." 10 V.S.A. § 1410(a)(4).

281. Defendants' contamination of the groundwater in Shaftsbury and Bennington with toxic PFOA constitutes unreasonable harm through the alteration of the character or quality of the groundwater in violation of the Groundwater Protection Act, 10 V.S.A §1410(c).

282. Plaintiffs are "persons" within the meaning of 10 V.S.A. § 1410(b)(3), and are persons who may maintain an action under the Groundwater Protection Act for equitable relief and/or recover damages for Defendants' unreasonable harm to the groundwater in Shaftsbury.

283. As a direct and proximate result of Defendants' violation of the Groundwater Protection Act, Defendants are also liable to Plaintiffs for equitable relief, including, but not limited remediation and clean-up of the contaminated groundwater. Defendants are also liable to Plaintiffs for damages for its unreasonable harm to the groundwater, including damage to the water supply itself.

## COUNT VI: MEDICAL MONITORING PURSUANT TO 12 V.S.A § 7202

284. Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if they were set forth herein.

285. PFOA is a "proven toxic substance" as explained in paragraph 45.

286. Defendant SGPP was an owner and operator of a "large facility" because at all times relevant herein, the SGPP Facilities employed 10 or more full-time employees and engaged in a manufacturing activity that falls within a Standard Industrial Classification code of 20 through 39.

287. Defendant SGPP released PFOA from the SGPP Facilities and PFOA entered the air, land, surface water, and/or groundwater in and around Shaftsbury and southern Bennington.

288. Defendant SGPP's tortious conduct as alleged herein, including but not limited to negligence, nuisance, and strict liability, resulted in the release of PFOA into the air, land, surface water, and/or groundwater in and around Shaftsbury and southern Bennington.

289. Plaintiffs were exposed to PFOA as a result of Defendant SGPP's tortious conduct as alleged herein.

290. Defendant 3M was an owner and operator of a "large facility" because at all times relevant herein, its facilities employed 10 or more full-time employees and engaged in a manufacturing activity that falls within a Standard Industrial Classification code of 20 through 39.

291. Defendant 3M manufactured APFO, at one or more of its large facilities.

292. Defendant 3M sold APFO to Defendant SGPP for use in its manufacturing processes at the SGPP Facilities, as described in paragraph 33.

293. Defendant 3M sold APFO to Defendant DuPont which utilized the chemical to produce APFO-containing AFD products which were sold to Defendant SGPP as described in paragraph 34.

294. As a result of Defendant 3M's manufacture and sale of APFO to both Defendants SGPP and DuPont, Defendant 3M released PFOA from one or more of its large facilities and PFOA entered the air, land, surface water, and/or groundwater in and around Shaftsbury and southern Bennington.

295. Defendant 3M's tortious conduct as alleged herein, including but not limited to negligence, nuisance, and strict liability failure to warn resulted in the release of PFOA into the

air, land, surface water, and/or groundwater in and around Shaftsbury and southern Bennington.

296. Plaintiffs were exposed to PFOA as a result of Defendant 3M's tortious conduct as alleged herein.

297. Defendant DuPont was an owner and operator of a "large facility" because at all times relevant herein, its facilities employed 10 or more full-time employees and engaged in a manufacturing activity that falls within a Standard Industrial Classification code of 20 through 39.

298. Defendant DuPont manufactured APFO-containing AFD products, at one or more of its large facilities which were sold to Defendant SGPP as outlined in paragraphs 21-22 herein.

299. As a result of Defendant DuPont's manufacture and sale of AFD products to Defendant SGPP, Defendant DuPont released PFOA from one or more of its large facilities and PFOA entered the air, land, surface water, and/or groundwater in and around Shaftsbury and southern Bennington.

300. Defendant DuPont's tortious conduct as alleged herein, including but not limited to negligence, trespass, nuisance, and strict liability failure to warn resulted in the release of PFOA into the air, land, surface water, and/or groundwater in and around Shaftsbury and southern Bennington

301. Plaintiffs were exposed to PFOA as a result of Defendant DuPont's tortious conduct as alleged herein.

302. As a proximate result of Plaintiffs' exposure to PFOA caused by the tortious conduct of all Defendants, Plaintiffs have suffered an increased risk of contracting a serious disease, including two forms of cancer.

303. The increased risk makes it medically necessary for Plaintiffs to undergo periodic

medical examinations different from that prescribed for the general population in the absence of exposure.

304. Medical monitoring procedures for PFOA exist and are reasonable in cost and safe to use, such as those recommended by the NASEM Advisory Committee.

**RELIEF DEMANDED**

WHEREFORE, Plaintiffs and Members of the above proposed Class respectfully request this Court to Grant the following relief:

(a) That this case be certified as a Class action as proposed in this Complaint pursuant to the applicable Rules of Civil Procedure;

(b) A declaration that Defendants acted with negligence, gross negligence, and/or willful, wanton, and careless disregard for the health, safety, and property of Plaintiffs and Members of the Classes;

(c) Award Plaintiffs and Class Members damages in an amount greater than Five Million Dollars ($5,000,000) sufficient to compensate them for damage to real property, out of pocket expense including unreimbursed expenses associated with obtaining potable drinking water, personal property damage, loss of use and enjoyment of property, diminution in property value, the necessity for long-term medical monitoring, annoyance, upset, aggravation, and inconvenience;

(d) Issue an injunction requiring Defendant to: (1) connect each impacted water supply within the Zone of Contamination onto municipal water; (2) the establishment and implementation of remedial measures sufficient to permanently prevent PFOAs from further contaminating Plaintiffs' and Class Members' drinking water supplies and/or properties; (3) the establishment and implementation of a long-term medical testing

protocol for Plaintiffs and Class Members to monitor their health and diagnose at an early stage any ailments associated with exposure, inhalation or ingestion of PFOA; and ( 4) the establishment of additional steps, to be proven at trial, that are determined necessary to remediate Plaintiffs' and all Class Members' properties and/or residences to eliminate the presence of PFOA;

(e) Award appropriate equitable relief and damages for Defendants' unreasonable harm to groundwater pursuant to Vermont Groundwater Protection Act, 10 V.S.A. § 1410(c);

(f) Award the cost to fund a court-supervised long-term medical monitoring program administered by one or more appropriate health professionals, including professionals with expertise in exposure to toxic substances or expertise with treating or monitoring the relevant latent disease or diseases pursuant to 12 V.S.A. § 7202;

(g) Award punitive damages as a result of Defendants' intentional, grossly negligent and reckless disregard for the safety of Plaintiffs and others in their communities;

(h) Award attorney fees and costs and expenses incurred in connection with the litigation of this matter; and

(i) Award such other and further relief as this Court may deem just, proper, and equitable.

## JURY DEMAND

Pursuant to the Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of any and all issues in this action so triable of right.

Dated: August 25, 2026

David F. Silver, Esq. (VT Bar No. 2438)
Alexander M. Dean, Esq. (VT Bar No. 5839)
BARR, STERNBERG, MOSS, SILVER & MUNSON, P.C.
507 Main Street
Bennington, VT 05201
Phone: (802) 442-6341
Fax: (802) 442-1151
Email: dsilver@barrsternberg.com
Email: adean@barrsternberg.com

Stephen G. Schwarz, Esq. (NY Bar No. 2008936)
*(pro hac vice pending)*
Hadley E. Lundback, Esq. (NY Bar No. 4377875)
*(pro hac vice pending)*
Teagan C. Dolan, Esq. (NY Bar No. 6039192)
*(pro hac vice pending)*
FARACI LANGE, LLP
1882 South Winton Road, Suite 1
Rochester, NY 14618
Phone: (585) 325-5150
Fax: (585) 325-3285
Email: sschwarz@faraci.com
Email: hadley@faraci.com
Email: tdolan@faraci.com

Gary A. Davis, Esq. (NC Bar No. 25976)
*(pro hac vice pending)*
Keith A. Johnston, Esq. (TN Bar No. 024134)
*(pro hac vice pending)*
DAVIS, JOHNSTON & RINGGER, PC
21 Battery Park Avenue, Suite 206
Asheville, NC 28801
Phone: (828) 622-0044
Fax: (828) 398-0435
Email: gadavis@enviroattorney.com
Email: kjohnston@enviroattorney.com

*Attorneys for Plaintiffs*